**DICKERSON, INC., Dickerson, Florida, Inc., Dickerson Realty Florida, Inc., Plaintiffs–Appellees,**

v.

**UNITED STATES of America, Defendant–Appellant.**

No. 88–3449.

United States Court of Appeals, Eleventh Circuit.

June 27, 1989.

Robert S. Greenspan, John P. Schnitker, and Dwight G. Rabuse, Civ. Div. Appellate Staff, U.S. Dept. of Justice, Washington, D.C., for defendant-appellant.

Richard G. Rumrell, Rumrell & Johnson, Jacksonville, Fla., for plaintiffs-appellees.

Before RONEY, Chief Judge, and HILL, Circuit Judge, and HOWARD *, Chief District Judge.

RONEY, Chief Judge:

In this Federal Tort Claims Act (FTCA) suit against the United States for damages resulting from improper disposal of hazardous waste materials, we affirm the district court's judgment against the Government, holding: (1) the United States was not exempt from liability under the discretionary-function exception to the FTCA for the decision to delegate to an independent contractor safety responsibilities for the disposal of certain toxic waste: polychlorinated biphenyls (PCBs), and (2) under the authority of *Emelwon, Inc. v. United States*, 391 F.2d 9 (5th Cir.), *cert. denied*, 393 U.S. 841, 89 S.Ct. 119, 21 L.Ed.2d 111 (1968), the FTCA's independent-contractor exception is inapplicable to exempt the Government from liability because under the relevant Florida tort law, the duty of due care for

* Honorable Alex T. Howard, Jr., Chief U.S. District Judge for the Southern District of Alabama, sitting by designation.

inherently dangerous activities is nondelegable.[1]

### The Facts

Plaintiff Dickerson, a company primarily engaged in road paving and other asphalt work, had three facilities in Jacksonville, Florida. The operations of these facilities included heating asphalt prior to paving with it. To heat the asphalt Dickerson initially burned diesel fuel. After the 1978 oil embargo, however, the company also began using a comparatively cheap fuel, waste oil. Holloway Waste Oil Company (Holloway) was Dickerson's primary source of this cheaper fuel. American Electric Corporation (AEC) in turn was Holloway's principal source.

The defendant United States Government became involved in this case through the actions of the Defense Property Disposal Service (DPDS), an agency within the Department of Defense. DPDS bore responsibility for disposal of PCBs from military installations throughout the country. PCBs are highly toxic chemicals frequently used in electrical transformers.

In 1981 DPDS contracted with private companies to transport and dispose of these PCBs. Two of the contracts were awarded to AEC. The first (known as the "Ogden I contract"), awarded in May 1981, was administered by Ernest Bertagnolli, a DPDS employee, and covered the disposal of PCBs from military installations in Utah and California. The second (known as the "Battle Creek I contract"), awarded in September 1981, was administered by Ronald Wagner, also a DPDS employee, and covered the northeastern and southern states. Bertagnolli and Wagner were contract specialists with little background or training in PCBs or other hazardous wastes.

As required by 40 C.F.R. §§ 262.20–262.-23, DPDS employed a "manifest" system to keep track of PCBs. The manifest was in essence a shipping document containing the following information: the name and address of the generator of the wastes; the names of all transporters; a description of the amount, composition, and quantity of the wastes; the number and types of containers; and the origin, routing, and destination of each shipment. The generator (here, the Department of Defense) of the wastes had to certify that the information on the manifest was accurate and the materials were acceptable for transporting. No one at DPDS, however, had responsibility for determining whether a contractor properly disposed of wastes once it removed them from a military installation.

During the Ogden I contract, AEC would be paid if the waste item appeared on a manifest, the manifest was properly signed, and Bertagnolli received confirmation that some material had been removed. AEC received payment for *disposal* upon proof of *removal.* DPDS did not verify the disposal of any of the items under the Ogden I contract or communicate with any of the designated final disposal sites. Administering the Battle Creek I contract, Wagner likewise did little more than rely on the manifest documents provided by AEC.

In 1981 during the Ogden I contract, Bertagnolli learned from AEC employee Richard Schmigel that AEC's performance was not on the "up and up." Bertagnolli noted Schmigel's name and telephone number and gave it to DPDS's legal counsel, but, believing that Schmigel was merely a disgruntled AEC employee, Bertagnolli never looked into the matter or reported it to Wagner.

The contracts required color-coded, segregated storage prior to disposal of PCB-contaminated waste oil according to three categories: those with PCB concentrations of less than 50 parts per million, those 50 or greater but less than 500 parts per million, and those 500 parts per million or greater. These categories corresponded to Environmental Protection Agency (EPA) regulations requiring greater precautions in storing and disposing of PCBs of greater

---

1. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (in banc), this Court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

concentrations. *See* 40 C.F.R. §§ 761.60–761.79.

When the Ogden I contract commenced, only two facilities, Rollins and ENSCO, were licensed to incinerate wastes with concentrations of greater than 500 parts per million of PCBs. Bertagnolli later learned from another AEC employee, Audrey Quackenbush, that AEC was having difficulty completing disposal under the Ogden I contract because AEC did not have signed contracts with the disposal sites. Quackenbush also indicated that AEC had commingled the PCB-contaminated waste oil in the tanks at its Jacksonville facilities.

Holloway bought PCB-contaminated waste oil from AEC, hauled it from AEC's storage tanks, and ultimately resold and delivered much of it to Dickerson. In January 1982, Bio–Environmental Services of Jacksonville informed Dickerson that tests revealed PCB concentrations of greater than 500 parts per million in storage tanks at all of Dickerson's facilities. DPDS instituted an investigation of the manifest system and found that it could not account for twenty-five percent of the PCBs disposed of under the Battle Creek I contract.

With permission from the EPA, Dickerson consolidated all of the PCB-contaminated waste oil in one large storage tank, encased the tank in concrete, contracted for a hazardous-waste disposal service to remove the contaminated waste oil, and hired security officers to stand guard until disposal was finally complete.

### The Complaint

Alleging that DPDS had been negligent in selecting AEC and failing to supervise its disposal of PCBs, Dickerson brought this FTCA action against the Government. The Government responded that it was excluded from liability under the independent-contractor and discretionary-function exceptions to the FTCA. The Government further contended that the alleged breach of duty was not the proximate cause of Dickerson's damages (an issue not raised in this appeal) and that Dickerson had been contributorily negligent.

Following a trial on Dickerson's claims, the district court concluded: *first,* that the discretionary-function exception applied to DPDS's decision to award the contracts but not to the decision to delegate safety responsibility to AEC and forego any supervision of it; and *second,* that under Florida tort law DPDS had a nondelegable duty to third parties, such as Dickerson, so that DPDS was not exempt from liability when it hired an independent contractor to perform an inherently dangerous activity. The court held that DPDS negligently breached its duty and proximately caused damage to Dickerson, and that Dickerson had not been contributorily negligent. The court entered a judgment against the Government in the amount of $916,995.17, later amended to $1,125,854.82.

### The Law

Consideration of a case such as this under the FTCA requires a three-step inquiry:

*First,* are the alleged negligent acts or omissions discretionary functions which are immune from suit under the FTCA?

*Second,* if not, does FTCA's independent-contractor exception apply to insulate the Government against liability?

*Third,* if not, are the theories of liability asserted cognizable under the applicable state tort law?

### A. Discretionary–Function Exception

The discretionary-function exception provides, in relevant part, that liability shall not lie for:

[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C.A. § 2680(a).

The basic inquiry concerning this exception is "whether the challenged acts ... are of the nature and quality that Congress intended to shield from tort liability." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984). This exception pro-

tects only governmental actions and decisions involving the *"permissible"* exercise of policy judgment. *Berkovitz v. United States,* 486 U.S. ——, 108 S.Ct. 1954, 1959, 100 L.Ed.2d 531 (1988) (emphasis added). It does not apply "when a federal statute, regulation, or policy specifically prescribes a course of action for [a Government] employee to follow." *Id.* at ——, 108 S.Ct. at 1958. In other words, this exception applies to policy judgments, even to those constituting abuse of discretion, but not to choices which are either outside the policy-making context or in an area in which federal law directs a particular course of action.

■ The district court properly concluded that the federal statutes, regulations, and policies made the discretionary-function exception unavailable to the Government in this case. Plainly, Congress intended that the liability provisions of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) would normally cover the owner of a facility generating hazardous waste and anyone who arranges for the waste's transportation and disposal. 42 U.S.C.A. § 9607(a). This liability provision applies to governmental agencies and facilities. 42 U.S.C.A. §§ 9607(g) & 9620(a)(1) & (2). CERCLA allows the defense that the release or threatened release of hazardous waste resulted from the acts or omissions of a third party. That defense is unavailable, however, to one in a contractual arrangement with the third party or to one who has not exercised due care with respect to the hazardous waste and has not taken precautions against foreseeable consequences of the third party's foreseeable acts or omissions. 42 U.S.C.A. § 9607(b)(3).

CERCLA's provisions suggest an ongoing safety obligation for the generator of hazardous wastes which would be inconsistent with the Government's argument that it was a discretionary decision for DPDS to transfer all potential liability to its independent contractor by delegating completely to it the safety responsibilities for disposal of PCBs.

EPA regulations, 40 C.F.R. §§ 262.20–262.23, required DPDS to use a manifest tracking system to trace the path of hazardous waste disposal. These regulations, promulgated pursuant to congressional mandate, 42 U.S.C.A. § 6922(a)(5), reflect that federal law imposed on DPDS ongoing obligations toward safe toxic-waste disposal, thereby restricting DPDS's authority to make discretionary policy decisions to delegate safety responsibilities.

The district court found, based primarily on a letter written by the administrator of the Battle Creek I contract, that DPDS had an internal policy of "cradle to grave" responsibility for safe disposal of PCBs. The Government apparently disputes the district court's finding that this internal policy existed. On appeal, however, this Court is bound by the district court's findings of fact unless they are "clearly erroneous." Fed.R.Civ.P. 52(a). Applying this standard, we must accept this finding since the record contains sufficient support for it.

The phrase "cradle to grave," when used in the toxic waste context, normally refers to the Resource Conservation and Recovery Act of 1976, 42 U.S.C.A. §§ 6901 *et seq.,* and the extent of its regulatory scheme governing the handling of hazardous wastes from the initial point where they are generated (the cradle) to their ultimate disposal (the grave). *See, e.g., United States v. Hayes International Corp.,* 786 F.2d 1499, 1501 (11th Cir.1986).

■ Here, however, it is used to describe the scope of an internal policy at DPDS recognizing continuing responsibilities for the safe disposal of PCBs. This provides an additional reason why the discretionary-function exception would not apply in this instance: the agency's own policies "specifically prescribe[d] a course of action for an employee to follow." *See Berkovitz v. United States,* 486 U.S. at ——, 108 S.Ct. at 1958.

This decision is not contrary to *Johns v. Pettibone Corp.,* 843 F.2d 464 (11th Cir. 1988). *Johns* applied the doctrine of official immunity for discretionary decisions to the Tennessee Valley Authority's decision

to delegate to an independent contractor responsibility for the safety of the contractor's employees. *Id.* at 466–67. The considerations which apply in such a case clearly differ from the unique context of the hazardous-waste statutory, regulatory, and policy restrictions which governed DPDS's responsibilities for disposal of PCBs.

The acts challenged here were not the sort which Congress intended to shield from tort liability, did not involve the permissible exercise of policy judgment, and the discretionary-function exception does not apply.

### B.  *Independent–Contractor Exception*

The FTCA imposes civil liability on the United States for loss caused by negligence of a Government employee under circumstances where a private person would be liable under the law of the state where the negligent act occurred. 28 U.S.C.A. § 1346(b). Although the FTCA waived the Government's immunity to suits by victims of the "ordinary common-law torts" of employees of federal agencies, *see Dalehite v. United States,* 346 U.S. 15, 28, 73 S.Ct. 956, 964, 97 L.Ed. 1427 (1953), Congress specifically excluded "any contractor with the United States" from the FTCA's definition of a "federal agency." *See* 28 U.S.C.A. § 2671.

In *Emelwon, Inc. v. United States,* 391 F.2d 9, 10–13 (5th Cir.), *cert. denied,* 393 U.S. 841, 89 S.Ct. 119, 21 L.Ed.2d 111 (1968), this Court held that although the United States is not liable under the FTCA for the negligence of an independent contractor, it may be liable, just as any private citizen would be, under an applicable state tort theory for its own negligence in failing to prevent harm to third parties when the activity contracted for was inherently dangerous or when the Government was aware that the contractor had created a dangerous situation.

The Government argues that this decision is no longer good authority because *Emelwon* in essence imposes strict liability on a federal agency for the negligence of an independent contractor, contrary to limitations included in the FTCA.

■ *Emelwon* plainly stated that under the FTCA a federal agency "may not be held liable without fault" and an independent contractor's negligence may not be "imputed" to the agency. *Id.* at 10. The governmental agency may, however, be liable to third parties for its own negligence in discharging a nondelegable duty imposed under state tort law. *Id.* at 11–12. Since *Emelwon,* Supreme Court decisions have not eroded its authority. They have merely stated that an employee of the United States will not be held liable under any theory of strict liability or be held vicariously liable for the acts of an independent contractor over whom he had little control, although he may be found liable for his own negligence. *E.g., Logue v. United States,* 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973); *Laird v. Nelms,* 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972). These principles do not conflict with *Emelwon. See Griffin v. United States,* 637 F.2d 308, 309–10 (5th Cir.1981).

In one post-*Emelwon* decision this Court stated that limitations on FTCA liability imposed by 28 U.S.C.A. §§ 1346(b) and 2671 "foreclose[d] any theory of liability in this case based on some nondelegable duty of the employer of an independent contractor for the performance of hazardous activities." *Aretz v. United States,* 604 F.2d 417, 427 (5th Cir.1979), *reh'g granted,* 616 F.2d 254 (1980), *opinion of panel reinstated,* 660 F.2d 531 (Former 5th Cir. Nov. 1981) (in banc). This statement that certain theories of liability were inapplicable, however, applied to the specific facts of that case and, further, was merely dictum since the ultimate holding was that the district court did not err in finding the Government liable under another theory. *Aretz,* 604 F.2d at 431, 433.

Both the Fifth and Eleventh Circuits have been careful to determine whether subsequent cases are distinguishable from *Emelwon. E.g., Cole v. United States,* 846 F.2d 1290, 1295 n. 9 (11th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 492, 102

L.Ed.2d 529 (1988); *Scofi v. McKeon Constr. Co.*, 666 F.2d 170, 172 n. 2 (5th Cir.1982).

■ *Emelwon* thus remains binding authority in the Eleventh Circuit, *see Bonner v. Prichard*, 661 F.2d at 1209, and no *panel* of the court has authority to overrule it, *see Minor v. Dugger*, 864 F.2d 124, 126 (11th Cir.1989). Therefore, the independent contractor exception in the FTCA would not insulate the Government from the contractor's negligence if the duty was non-delegable under Florida law.

## C. *Florida Tort Law*

■ Under Florida law, if the work contracted for is an inherently dangerous activity, the employer has a nondelegable duty of reasonable care to take precautions ensuring that the independent contractor carries out the task in a non-negligent manner. *See Emelwon*, 391 F.2d at 11 (citing Florida cases). The United States does not dispute that Florida's tort law applies in this case. Rather, the Government maintains that under Florida tort law transportation and disposal of PCBs is not an inherently dangerous activity and, even if it is, Dickerson was contributorily negligent for failing to comply with its state air-quality permit.

For determining if the work contracted for is inherently dangerous, "the test to be applied is whether the 'danger inheres in the performance of the work; and it is sufficient if there is a recognizable and substantial danger inherent in the work, even though a major hazard is not involved.'" *Madison v. Midyette*, 541 So.2d 1315 (Fla. 1st DCA 1989) (quoting *Florida Power & Light Co. v. Price*, 170 So.2d 293, 295 (Fla.1964)).

Scientists have found PCB concentrations far below those involved in this case to cause cancer, decreased fertility, still births, and birth defects in test animals. *Environmental Defense Fund v. Environmental Protection Agency*, 636 F.2d 1267, 1270 (D.C.Cir.1980). Although Florida courts apparently have not yet considered the question of whether PCB disposal is inherently dangerous, we faced a similar problem in *Emelwon*, where Florida courts at that time had not yet decided whether crop-dusting was inherently dangerous. The EPA has noted the "well-documented human health and environmental hazard of PCB exposure" and the "potential hazard of PCB exposure posed by the transportation of PCBs." 40 C.F.R. § 761.20. Indeed, PCBs pose such health and environmental dangers that the Toxic Substances Control Act bans the manufacturing of PCBs in this country without a special exemption from the EPA. 15 U.S.C.A. §§ 2605(e)(3)(A) & (B). We conclude that the Florida courts, if confronted with this question, would hold that there is a recognizable and substantial danger inherent in the transportation and disposal of this highly toxic material.

Thus, the acts and omissions of DPDS employees were such that if they had been private persons they would have been liable under Florida law, even though they had contracted with an independent contractor to dispose of the waste material. They did not exercise reasonable care to ensure that AEC performed its inherently dangerous work in a non-negligent manner.

■ Both Schmigel and Quackenbush informed Bertagnolli of serious problems with AEC's performance under the contracts. Manifests submitted to Bertagnolli showed disposal of much less PCB waste than the Government had estimated needed to be disposed. Notwithstanding these warning signs, DPDS made no inquiries. Bertagnolli did not contact the Rollins and ENSCO disposal facilities to see if AEC had contracts with them. DPDS did not verify disposal or communicate with final disposal sites. AEC submitted numerous invoices listing American Environmental Protection Agency at an address in Greensboro, Alabama as a storage or treatment facility for PCB-contaminated liquids and equipment. This address, however, was the site of the AEC Vice President's antebellum home, not a storage or treatment center for PCBs. Regardless of whether DPDS would normally have been obligated to inquire into these matters, it reasonably should have, given the indications of AEC's

problems. Wagner admitted that the problems at AEC could have been avoided at an early stage "if we'd sent more of our technical people down to their facility to look for themselves."

The district court was not clearly erroneous in concluding that DPDS employees failed to discharge their duty of due care under Florida tort law. Despite circumstances that reasonably should have alerted them to the potential dangers posed by AEC's inadequate performance, they failed to take precautions to ensure that AEC disposed of the PCBs in a safe manner.

██ Apparently as an independent ground for finding negligence, the court *sua sponte* found violations of provisions in CERCLA, TSCA, and EPA regulations and concluded that these violations constituted *prima facie* evidence of negligence under Florida law. Since there is sufficient independent proof of negligence under Florida law, we need not address the argument that such a decision is at odds with the principle that the FTCA "was not intended to redress breaches of federal statutory duties." *Sellfors v. United States,* 697 F.2d 1362, 1365 (11th Cir.1983), *cert. denied,* 468 U.S. 1204, 104 S.Ct. 3571, 82 L.Ed.2d 870 (1984).

The district court concluded that Dickerson's "failure to timely apply" for a permit to burn waste oil did not support the Government's defense of contributory negligence. The record indicates that Dickerson began using waste oil around 1978 pursuant to a cost-saving business judgment. There was no industry-wide practice in the paving business of testing waste oil for PCBs. Apparently at some unspecified point in 1981, Dickerson sought a permit to burn waste oil, but it was not granted. Precisely when, prior to the January 1982 discovery, Dickerson's storage tanks became contaminated with PCBs is uncertain.

Dickerson's damages resulted from the contamination of its waste oil tanks and the resulting cost of PCB disposal, not from *burning* PCB-contaminated waste oil. Dickerson apparently did not violate its existing permit by buying or storing waste oil in anticipation of burning it. If it had timely obtained a permit to burn waste oil—even if testing the waste oil was necessary to obtaining the permit—that would not have prevented the contamination of its storage tanks. The permit-obtaining process should have occurred around 1978, when Dickerson began using waste oil, which would have been well before the PCB contamination some time in 1981. We agree that the air-quality permit issue does not support the claim of contributory negligence.

In summary, the discretionary-function and independent-contractor exceptions did not exempt the Government from liability, there was sufficient proof that DPDS employees breached a duty of due care imposed by Florida tort law, and Dickerson was not shown to be contributorily negligent.

AFFIRMED.