**FLORIDA POWER & LIGHT CO., et al., Plaintiffs,**

v.

**ALLIS–CHALMERS CORP., et al., Defendants.**

**No. 86–1571–Civ.**

United States District Court, S.D. Florida.

April 9, 1990.

See also 893 F.2d 1313.

David F. McIntosh, Corlett, Killian, Ober, Hardeman, McIntosh & Levi, P.A., Miami, Fla., for Allis–Chalmers Corp.

David A. Baker, Foley, Lardner, Van Den Berg, Gay, Burke, Wilson & Arkin, Orlando, Fla., for Central Moloney, Inc.

Thomas M. Burke, Rumberger, Kirk, Caldwell, Cabaniss, Burke & Wechsler, P.A., Orlando, Fla., for General Elec.

Edward L. Magill, Magill & Lewis, P.A., Miami, Fla., for RTE Corp.

Paul L. Nettleton, Popham Haik Schnobrich & Kaufman, Ltd., Miami, Fla., for Westinghouse Elec. Corp.

Richard M. Leslie, Shutts & Bowen, Miami, Fla., for Kuhlman Corp.

Herbert Sparrow, Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit, Mich., for Kuhlman Corp.

James M. Porter, Squire, Sanders & Dempsey, Miami, Fla., for McGraw–Edison and Wagner Elec. Corp.

Norman A. Coll, Coll, Davidson, Carter, Smith, Salter & Barkett, P.A., Miami, Fla., for FPL.

R. Hugh Lumpkin, Keith, Mack, Miami, Fla., William M. Martin, Patrick J. Toomey, Peterson & Bernard, Ft. Lauderdale, Fla., for Peppers, Bloom.

John W. Wilcox, Rudnick & Wolfe, Tampa, Fla., for Curtis, Payne and Miami Battery.

## ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT.

ATKINS, Senior District Judge.

This cause is before the court on the defendants' motion for partial summary judgment. Fed.R.Civ.P. 56. The motion addresses those counts in which the plaintiffs seek to recover damages from the defendants based on claims of restitution and indemnity. A hearing on the motion was held December 11, 1989, after at least ten days notice of such hearing. Now, upon consideration of the motion, the responsive memoranda, the affidavits, and the relevant case law and federal rules, it is

ORDERED AND ADJUDGED that:

(1) The defendants' motion is *GRANTED* as to the plaintiff Florida Power & Light Company ("FPL");

(2) The defendants' motion is *GRANTED* as to the plaintiffs Pepper's Steel & Alloys, Inc. and Norton Bloom (collectively, "PEPPER'S");

(3) The defendants' motion is *GRANTED* as to intervening plaintiffs William U. Payne, Flora B. Payne, Lowell Payne, and Thomas A. Curtis (collectively "the landowners" or "the intervening plaintiffs"); and

(4) The court shall, in a separate order, enter Final Judgment against plaintiffs FPL and PEPPER'S.

### A.

*Facts and Background Information.*

The following facts are not in dispute. The defendants are all current or former manufacturers of electrical transformers. The transformers at issue in the present case contained mineral oil in accordance with their design. During the manufacturing process, the mineral oil became contaminated with polychlorinated biphenals ("PCBs"), a hazardous chemical compound.

The defendants, pursuant to their ordinary course of business, sold electrical transformers to FPL. FPL bought these transformers for use in its day-to-day business of supplying electrical power to consumers in Florida. When the transformers reached the ends of their useful lives, FPL sold them as scrap to Pepper's Steel & Alloy, Inc. and its owner/president, Norton Bloom. FPL made these sales to PEPPER'S from approximately 1967 until 1982. Upon receipt of the scrap transformers, PEPPER'S would strip them to recover various valuable metals for resale. This stripping process was carried out at the Pepper's Steel site, a thirty acre parcel of

land located in Medley, Florida.[1]

As described in greater detail in this court's Order Granting Motion for Partial Summary Judgment (March 20, 1989) (the "Statute of Limitations Order"), an investigation conducted in 1982 by the United States Environmental Protection Agency ("EPA") revealed the presence of unacceptable levels of PCBs, lead, arsenic, and antimony at the PEPPER'S site. On July 11, 1983, the EPA filed an emergency environmental cleanup action against PEPPER'S under § 104(a) of the Comprehensive Environmental Response, Compensation & Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601–9657. On July 13, 1983, the Florida Department of Environmental Regulation ("DER") filed a similar action against PEPPER'S under the state counterpart to CERCLA. And on March 5, 1985, the United States, at the request of the EPA, sued PEPPER'S and FPL under § 107 of CERCLA to recover the costs incurred in the cleanup. The present defendants were not named as defendants or responsible parties in any of the foregoing actions.

FPL commenced the present action on July 18, 1986. PEPPER'S and the landowners thereafter intervened as plaintiffs. In the present action, the plaintiffs seek to recover from the defendants the costs incurred by the plaintiffs in connection with the EPA and DER actions. The plaintiffs also seek to recover damages based on several lawsuits filed by former PEPPER'S employees against FPL and PEPPER'S.[2] At the present juncture, all that remains of FPL's and PEPPER'S actions are their claims for restitution (FPL Amended Complaint, count X; PEPPER'S Amended Complaint, count VI) and indemnity (FPL Amended Complaint, count II; PEPPER'S Amended Complaint, count II).[3] The land-

owners have also asserted a variety of claims against the defendants, including a count for restitution (Landowners' Complaint, count VI). By the present motion, the defendants seek summary judgment against all three groups of plaintiffs on their restitution counts, and against FPL and PEPPER'S on their indemnity counts.

## B.

### *Discussion.*

1. Standards for Motion for Summary Judgment.

◼◼◼ Summary judgment should be entered if, after a review of all the evidentiary material in the record, "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is mandated after "a sufficient time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and upon which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party has the initial burden of identifying evidence which it believes shows an absence of a genuine issue of material fact. This burden may be discharged by demonstrating that there is an absence of evidence to support the nonmoving party's case. *Id.* at 323–25, 106 S.Ct. at 2552–53. If the moving party discharges this burden, the nonmoving party "may not rest upon mere allegation or denials ..., but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

---

**1.** The site was comprised of three ten-acre parcels owned by Bloom, Curtis, and the Paynes.

**2.** The first of these employee actions was filed in Florida state court in 1983. The actions sounded in various personal injury claims, and they sought recovery against PEPPER'S, FPL, and the defendants. At this juncture, the defendants (with the exception of defendant Westinghouse) have settled their cases with the remaining employees and have been dismissed from

the pending actions. Thus, the only state court actions still pending seek recovery from PEPPER'S, FPL, and defendant Westinghouse.

**3.** In two prior orders, this court eliminated the other counts originally asserted by FPL and PEPPER'S. *See* Order Granting Summary Judgment (March 21, 1988) (the "CERCLA Order") and the Statute of Limitations Order.

With these principles in mind, we now turn to the restitution and indemnity counts which the defendants attack through their motion for summary judgment.

## 2. Restitution.

The term "restitution" denotes a form of equitable relief. The term describes those situations in which "a party would arguably be unjustly enriched if allowed to retain without paying for it some benefit that had been conferred upon him." Farnsworth, *Contracts* 98 (1982). In such situations, the courts will imply a "quasi-contract" between the provider and the recipient of the benefit at issue. Such quasi-contracts are "obligations imposed by the law on grounds of justice and equity, and do not rest upon the assent of the contracting parties. This legal fiction was adopted ... to provide a remedy in instances where one of the contracting parties is unjustly enriched." *Tipper v. Great Lakes Chemical Co.*, 281 So.2d 10, 13 (Fla.1973) (citations omitted); *see also Challenge Air Transport, Inc. v. Transportes Aereos Nacionales, S.A.*, 520 So.2d 323, 324 (Fla.Dist.Ct. App.1988) (action for "unjust enrichment" exists to prevent wrongful retention of benefit "in violation of good conscience and fundamental principles of justice or equity").

Certain restitution actions are grounded in the plaintiff's contention that he performed a duty that should have been performed by the defendant. In such cases, the courts must, as stated in *Tipper,* apply the following general principles and specific considerations:

> The basic principle is that a person who officiously confers a benefit upon another is not entitled to restitution therefor, and the general rule is that a person who without mistake, coercion or request has unconditionally conferred a benefit upon another is not entitled to restitution, *except* where the benefit was conferred under circumstances making such action necessary for the protection of the interests of the other or of a third person, apply to the performance of services for the benefit of another or the performance of a duty of another to a third person. Where it is *imperatively necessary for the protection of the interests of third persons or the public that a duty owed by another should be performed, a stranger who performs it may be entitled to restitution* from the other, even though his performance was without the other's knowledge or against his will.

*Tipper,* 281 So.2d at 13 (quoting 66 Am. Jur.2d, *Restitution and Implied Contracts* § 23) (first emphasis by *Tipper* court).[4] Embellishing the underscored section of the above-quoted passage, the court in *Variety Children's Hospital v. Vigliotti,* 385 So.2d 1052, 1053 (Fla.Dist.Ct.App. 1980) stated that: "[T]he preliminary question in determining whether the law should imply a contract ... turns upon whether the [defendant] has been unjustly enriched, and that determination turns on whether the [defendant] has an obligation or legal duty which has been satisfied by the efforts of another." [5]

■■■ These formulations define the restitution plaintiff's burden of persuasion. Where the plaintiff's theory of restitution recovery is that he has performed the duty of another, the plaintiff must first prove that he conferred a benefit upon (i.e., that he "enriched") the defendant. *See Challenge Air,* 520 So.2d at 324 (noting that

---

**4.** A more recent formulation of the general principles provides that the "essential elements" of a Restitution action are: (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; (3) acceptance and retention by the defendant of the benefit; and (4) the existence of circumstances that would make it inequitable for the defendant to retain the benefit without paying the value thereof. *Challenge Air,* 520 So.2d at 324 (quoting 17 C.J.S. *Contracts* § 6 (1955)).

**5.** It is true, as the parties observe, that this formulation resembles the principles delineated in the *Restatement of the Law of Restitution* § 115 (1937). Nevertheless, no case cited to this court specifically adopts § 115 as the binding law of the state; the *Tipper* court stated only that § 112 provided a "more concise statement" of the principles set forth in the text. *Tipper,* 281 So.2d at 13. Accordingly, this court will not, for the present purposes, rely directly on § 115.

"[i]t is axiomatic that there must be a benefit conferred before unjust enrichment exists"). Such a benefit may be conferred where the plaintiff satisfies an "obligation or legal duty" with which the defendant is charged. *Variety Children's Hospital v. Vigliotti*, 385 So.2d 1052, 1053 (Fla.Dist.Ct. App.1980). If the plaintiff makes this showing, he must then demonstrate that on the facts of the case, it would be unjust and inequitable to permit the defendant to retain the benefit without paying for it. *See supra* at 437 (collecting cases and authorities which describe equitable nature of restitution inquiry). If the plaintiff prevails on this "fairness" showing, there then arises a rebuttable presumption that the plaintiff is entitled to reimbursement from the defendant. *See Challenge Air*, 520 So.2d at 324.

■ Applying these principles to the facts of the present case, the court concludes that the plaintiffs have not conferred any benefit on the defendants. The defendants, as noted above, manufactured electrical transformers. They then sold these new transformers to FPL and others. When the transformers reached the end of their useful lives, FPL sold them to PEPPER'S. Years after the sale between the defendants and FPL, PEPPER'S stripped the spent transformers, thereby contaminating the PEPPER'S site with PCBs. In light of this chronology, the defendants cannot be charged with creating the hazard at the PEPPER'S site: although the defendants' transformers did, in fact, contain PCBs, there is no evidence that the transformers posed a hazard of any sort until *after* they were stripped at the PEPPER'S site. *Cf.* 40 C.F.R. § 761.20 (1988) (mere manufacture of enclosed items containing PCBs is *not* prohibited by federal law). Because the defendants did not contaminate the PEPPER'S site, they had no duty to clean it up. Accordingly, the plaintiffs conferred no benefit upon the defendants when they (the plaintiffs) paid the clean-up costs incurred in connection with the PEPPER'S site.

This conclusion is borne out when we compare this case to the facts of *Tipper*.

In *Tipper*, the defendant's tractor-trailer was hauling a load of methyl bromide gas cylinders. The tractor-trailer collided with another vehicle in Florida and "[d]eadly gas began escaping from the cylinders immediately upon impact." 281 So.2d at 11. Louis Tipper, a local expert in handling poison gas, was summoned to the scene. Tipper had no formal employment relationship with the defendant, but he nevertheless spent the next five hours helping to clean up the contaminated site. In the process, Tipper sustained injuries and had to be hospitalized for three weeks. Finding, however, that Tipper's services did not give rise to an "implied contract of employment," a lower court denied Tipper's subsequently-filed claim for workman's compensation.

The Florida Supreme Court reversed. After setting forth the general principles described *supra* at 437–38, the court held that Tipper's conduct indeed gave rise to a quasi-contract of employment between himself and the defendant. To reach this result, the court stressed that the duty to clean up the methyl bromide spill lay, unsurprisingly, with the party who created the hazard. *See Tipper*, 281 So.2d at 14 (stating that if the collision had occurred near the defendant's home office, the defendant would have had to "dispatch[ ] a team of men to deal with the escaping lethal gas and protect the public and its own private interest"). By performing a duty which lay not with him but, rather, with the defendant, Tipper conferred an extremely valuable benefit on the defendant. *See id.* (noting that defendant was forced to rely on Tipper "to save innocent lives and protect [the defendant's own] property interests")

The present defendants, however, cannot be analogized to the *Tipper* defendant. The latter engaged in actions which created an emergency health hazard; the former merely manufactured and sold electrical transformers. Indeed, if any analogy exists, it is between the present defendants and the original, *non-party* manufacturer of the methyl bromide stored in *Tipper*. The present facts thus afford no warrant to imply a "quasi-contract" between the

defendants and the plaintiffs—the defendants are no more the quasi-employers of the plaintiffs than the non-party methyl bromide manufacturer was a quasi-employer of Mr. Tipper.

The plaintiffs' opposing arguments do not persuade. First, they argue that *Dickerson, Inc. v. United States*, 875 F.2d 1577 (11th Cir.1989) precludes a grant of summary judgment on the restitution counts. In *Dickerson*, the Defense Property Disposal Service ("DPSS"), a United States Defense Department agency charged with responsibility to remove PCBs from military installations, awarded contracts to the American Electric Corporation ("AEC") to dispose certain PCB–laden waste oil. AEC resold the oil to the Holloway Waste Oil Company, which in turn resold much of the oil to the plaintiff. When the Bio–Environmental Services of Jacksonville informed the plaintiff that the oil was contaminated with PCBs, the plaintiff sued DPSS for negligently "selecting AEC and failing to supervise its disposal of the PCBs." 875 F.2d at 1580 (summarizing complaint). After a nonjury trial, the district court concluded that DPSS had, in fact, acted negligently.

The government appealed. The Eleventh Circuit found, first, that the discretionary functions exception to the Federal Tort Claims Act did not, on the facts before the court, insulate the government from liability. The court then stated that because the service lying at the heart of the DPSS–AEC contract was "inherently dangerous," DPSS was charged, under Florida tort law, with "a nondelegable duty of care to take precautions ensuring that the independent contractor carries out the task in a non-negligent manner." *Dickerson*, 875 F.2d at 1583 (relying on *Emelwon, Inc. v. United States*, 391 F.2d 9, 11 (5th Cir.1968)). The court then reviewed the record and found "sufficient proof" that DPSS had, in fact, failed to exercise reasonable care in arranging for the disposal of the PCB-laden oil. Accordingly, the court affirmed the district court's order.

. Nothing in *Dickerson* helps the present plaintiffs. In *Dickerson*, the plaintiff proceeded on a *negligence* theory. As such, the DPSS owed the plaintiff a duty of reasonable care. This duty of course included the subsidiary duty to act reasonably in disposing of the PCBs. Because the defendant breached those duties, the *Dickerson* court, unremarkably, held the defendants liable for damages in negligence. The present plaintiffs, however, proceed on a *restitution* theory. *See* Statute of Limitations Order (plaintiffs' negligence counts are time-barred). Thus, the possibility that the defendants failed to exercise reasonable care in manufacturing and selling the transformers *sub judice* is wholly irrelevant to the plaintiffs' theory of recovery. Liability for restitution hinges not on the breach of a duty of care, but, rather, on the existence of equitable circumstances which warrant the implication of a "quasi-contract." Such circumstances do not exist in the present case. The plaintiffs therefore cannot prevail on their restitution claim.

.The plaintiffs next argue that other, non-binding cases involving asbestos litigation preclude summary judgment in this case. In *Hebron Public School District v. U.S. Gypsum*, 690 F.Supp. 866 (D.N.D.1988), for example, the plaintiff alleged that the defendant manufactured certain asbestos in 1960. In 1963, the defendant allegedly installed the asbestos to new additions in the plaintiff's school building. The plaintiff removed the asbestos from the building, incurred costs thereby, and then sued the defendant for damages in, *inter alia*, restitution. In denying the defendant's motion to dismiss under Rule 12(b)(6), the court stated that the complaint, read in its entirety, revealed that the plaintiff had plead sufficient facts upon which the plaintiff could prevail at trial. 690 F.Supp. at 869.

For many of the same reasons set forth above, neither *Hebron* nor the other cited asbestos cases help the present plaintiffs. In *Hebron*, the plaintiff alleged that the defendant had installed asbestos at its school. It is common knowledge that prolonged exposure to aged asbestos can cause severe, even fatal health hazards. Thus, by removing the asbestos and reinstalling safe materials, the *Hebron* plain-

tiff performed the defendant's duties to make safe a hazardous condition and to supply safe materials. 690 F.Supp. at 869. In the present case, by contrast, the defendants merely manufactured and sold new electrical transformers. These transformers might have contained PCBs; but, as noted above, the transformers posed no health threat until *after* they were stripped open at the PEPPER'S site. Because PEPPER'S itself stripped open the transformers, the present defendants, unlike the *Hebron* defendant, did not create the hazard forming the basis of the litigation. Accordingly, the present plaintiffs did not discharge the defendants' duty when they cleaned up the PEPPER'S site.

The court has considered the other arguments advanced by the plaintiffs and the court finds that they are meritless. Because there exists no genuine issue of law that warrants a trial on the plaintiffs' restitution count, the court *GRANTS* the defendants' motion for summary judgment as to those counts.

### 3. Indemnity.

■ The defendants have also moved for summary judgment on the indemnity claims asserted by FPL and PEPPER'S.[6] In *Houdaille Industries, Inc. v. Edwards*, 374 So.2d 490 (Fla.1970), the Florida Supreme Court observed generally that "[i]ndemnity is a right which inures to one who discharges a duty owed by him, but which, as between himself and another, should have been discharged by the other." 374 So.2d at 492–93. The *Houdaille* court then set forth the considerations which control the indemnity inquiry:

[Indemnity] is allowable only where the *whole* fault is in the one against whom the indemnity is sought.... It shifts the entire loss from one who, without active negligence or fault, has been obliged to pay, because of some vicarious, constructive, derivative, or technical liability.... Indemnity rests upon the fault of another which has been imputed to or con-

structively fastened upon the one seeking indemnity, and there can be no indemnification between joint tortfeasors.... A weighing of the relative fault has no place in the concept of indemnity for the one seeking indemnity must be without fault. Indemnity can only be applied where the liability of the person seeking indemnity is solely constructive or derivative and only against one who, because of his act, has caused such constructive liability to be imposed.

*Id.* at 493 (emphasis original) (citations omitted); *see also Allstate Ins. Co. v. Fowler*, 480 So.2d 1287, 1290 (Fla.1985) ("no-fault" requirement precludes action for indemnity between joint tortfeasors); *Motor Homes of America, Inc. v. O'Donnell*, 440 So.2d 422, 424 (Fla.Dist.Ct.App. 1983) (following *Houdaille*). To prevail on an indemnity claim, then, the plaintiff must prove: (1) that he was held liable to a third party; (2) that he was not in any way at fault for the circumstances giving rise to the liability; and (3) that liability was imposed on the plaintiff solely because of the plaintiff's "vicarious, constructive, derivative, or technical" relationship to the defendant. *See Houdaille*, 374 So.2d at 492–93; *see also K–Mart Corp. v. Chairs, Inc.*, 506 So.2d 7, 9 (Fla.Dist.Ct.App.1987) (with respect to third factor, plaintiff must demonstrate existence of "special relationship" between itself and defendant).

#### (a) *PEPPER'S Indemnity Claim.*

■ Applying the foregoing principles to the facts of the present case, the court concludes that PEPPER'S cannot recover on its indemnity claim. This conclusion is amply borne out by the record. Initial Dade County Environmental Resource Management ("DERM") investigations in March, 1975, revealed that transformer oil had "so saturated [parts of the PEPPER'S site] that oil and water is [sic] puddling throughout the area." DERM Memo from Robert Karafel to Anthony Bagnato (March 28, 1975), at 1. PEPPER'S was, later that year, convicted for discharging

---

6. The term "indemnity," as used herein, shall refer to common law indemnity unless otherwise indicated.

oil and grease onto the ground of its site, in violation of the Code of Metropolitan Dade County. *See State of Florida v. Pepper's Steel and Alloys, Inc.*, Case No. 75–62256 (Bench Docket, Oct. 3, 1975). The hazardous conditions persisted after the conviction. On May 10, 1977, DERM issued to PEPPER'S a Notice of Violation. The Notice provided, *inter alia*, that a March, 1977 inspection of the site "revealed the *same* conditions which resulted in court action on July 28, 1975, to wit: Allowing spilled oils and/or other organic and inorganic matter from salvaged electrical transformers to seep into the ground waters of Dade County." Notice, at 1 (emphasis added). The hazardous conditions at the PEPPER'S site nevertheless persisted and, ultimately, sparked the EPA and DER actions lying at the heart of this lawsuit.[7]

This sequence reveals that PEPPER'S was, at the very least, partially at fault for the PCB contamination at its site. PEPPER'S bought scrap transformers from FPL from 1967 until 1982. The transformers contained liquids laced with PCBs. PEPPER'S "salvaged" these scrap transformers and, as stated in the parties' pretrial stipulation, "[d]uring the salvage ... some of the dielectric fluid contained in [the transformers] was deposited on the ground at the Pepper's Steel site." Pretrial Stipulation, at 12.[8] In light of these uncontroverted facts, records, and stipulations, a finder of fact could not reasonably conclude that PEPPER'S acted "wholly without fault" with respect to the expenses incurred in the EPA and DER cleanup actions. Accordingly, pursuant to *Houdaille*, PEPPER'S cannot recover these expenses on a common law indemnity claim.

Even if this were not the case, PEPPER'S would still be unable to recover on its indemnity claim. PEPPER'S, as noted, itself stripped the scrap transformers. This action released onto the site oils containing PCBs. The PCB contamination ultimately led to the EPA and DER cleanup actions. PEPPER'S was, therefore, held primarily—not derivatively—liable for its own actions when it was forced to incur cleanup expenses. *Compare Houdaille*, 374 So.2d at 493–94 n. 3 (indemnity action by innocent manufacturer may lie against supplier of defective component where manufacturer is held liable solely because of the defective component); *K–Mart Corp.*, 506 So.2d at 9 ("The mere selling of a defective product by a retailer does not constitute 'fault' under *Houdaille*"; held: innocent retailer of swing set may bring indemnity action against distributor and primary manufacturer where customer injured by swing set sues retailer). Accordingly, PEPPER'S cannot even prevail on *Houdaille*'s "vicarious liability/special relationship" requirement.

PEPPER'S remaining arguments do not change these conclusions. First, PEPPER'S believes that because CERCLA actions assess liability without fault, it (PEPPER'S) cannot be said to have acted with any degree of fault in this case. This argument misperceives the nature of the present inquiry. The question before the court is whether, for purposes of *indemnity* recovery, a factfinder could reasonably conclude that PEPPER'S acted entirely without fault with respect to the circumstances engendering the EPA and DER cleanup expenses. That question must, as noted above, be answered in the negative. Second, PEPPER'S argues that its actions —specifically, its failure to discover the presence of PCBs prior to 1977—constitutes, at most, "passive" negligence. This argument misses the mark because it misstates the conduct sued upon: EPA and

---

7. After the DERM Notice was served but before the EPA/DER actions were commenced, PEPPER'S was again prosecuted—and convicted—for maintaining on its site a sanitary nuisance. *See State of Florida v. Pepper's Steel and Alloys, Inc.*, Case No. 77–67665 (Bench Docket, Aug. 11, 1978).

8. Parenthetically, the court observes that the quoted characterization is something of an un-

derstatement. The depositions of Messrs. Blake (Depo. at 15, 17, 22–25, 53, 59), Desormme (Depo. of Aug. 29, 1989, at 233; Depo. of July 14, 1983, at 109), and Herring (Depo. at 121–22) reveal that PCB–laced transformer oil was sometimes pumped into the bushes if it could not be contained in PEPPER'S specially-built transformer pad.

DER sued PEPPER'S not for failing to discover promptly the contents of the scrap transformers but, rather, for spilling those contents on the ground. This latter conduct, if not actually criminal or intentional, certainly cannot be characterized as "passive" negligence under the Florida case law.[9] Because none of PEPPER'S remaining arguments has merit, the court *GRANTS* the defendants' motion for summary judgment as to PEPPER'S indemnity count.

### (b) *FPL's Indemnity Claim.*

██ A similar result is reached when we apply the indemnity principles to FPL's claim. Long before FPL received from Westinghouse a letter advising that PCBs might be present in the transformer oil, *see* Westinghouse Letter (Nov. 22, 1976) (the "PCB letter"), FPL knew or should have known about PEPPER'S unsanitary disposal procedures. First, Maurice Talbert, an FPL employee, visited the PEPPER'S site in 1969 and described his observations in the following manner:

Q: Did you see anything on the ground that looked like oil?

A: Yes.

\*    \*    \*    \*    \*    \*

Q: [T]here was oil on the ground throughout this [approximately 75–by–100–foot storage] area or just portions of it?

\*    \*    \*    \*    \*    \*

A: I would say approximately 50%.

Q: Not to be facetious, but you understand that oil and water don't mix; correct?

A: Yes, I understand.

Q: How do you know it was oil?

A: By the sheen.

Q: Is it accurate to say that you know oil when you see it?

A: I would say that, yes.

Q: And you knew it in 1969?

A: Yes.

Q: And when you saw that oil on the ground at Pepper's Steel you knew it was oil?

\*    \*    \*    \*    \*    \*

A: Yes, I knew it was oil.

Talbert Depo. at 78–81. In addition to the actual knowledge afforded by the Talbert observations, the unsanitary conditions at the PEPPER'S site were, by the mid–1970s, matters of public record. *See supra* at 441–42 (describing PEPPER'S 1975 conviction for conditions at the site). Despite Talbert's observations and the fact of PEPPER'S conviction, FPL nevertheless continued, up until December, 1977, to sell to PEPPER'S scrap transformers filled with oils. For purposes of indemnity, then, this court fails to perceive any basis upon which a factfinder could conclude that FPL was in no way at fault for the contamination of the PEPPER'S site.

There exist other reasons to grant the motion for summary judgment as to FPL's indemnity claim. Even after receiving the PCB letter in January, 1977, FPL, without relaying the contents of the PCB letter to PEPPER'S, sold filled scrap transformers to PEPPER'S for approximately 9–11 months. Thereafter, FPL drained oil from the transformers prior to sale; but FPL continued to sell transformers that contained residual amounts of oil and, hence, PCBs. *See, e.g.*, Chow Depo. at 52 (FPL would "clear" for sale those transformers containing PCBs with concentrations of less than 50 parts-per-million). For these additional reasons, then, the court concludes that FPL is not completely free from fault with respect to the conditions at the PEPPER'S site. Accordingly, FPL cannot prevail on its indemnity claim.

---

**9.** The term "passive negligence" describes nothing more than those instances in which a defendant/third-party plaintiff is held liable solely on derivative or vicarious grounds. *See Howard Johnson Co. v. Orlando Executive Park, Inc.*, 496 So.2d 176, 177 (Fla.Dist.Ct.App.1986) ("active negligence" precludes indemnity recovery). To construe the term "passive negligence" more broadly would violate the fundamental rules that: (1) *any* fault on the part of the indemnity plaintiff, "no matter how slight," precludes recovery, *Houdaille*, 374 So.2d at 494, and (2) there can be no indemnity between joint tortfeasors.

**444**

4. Additional Matters.

█ Several additional matters require comment. First, PEPPER'S and FPL's indemnity claims also seek reimbursement for those expenses incurred in connection with the state court actions brought by former PEPPER'S employees. *See supra* note 2 and accompanying text. Although the plaintiffs' indemnity claims have already been disposed of, *see supra* § (B)(3), those claims must, so far as the plaintiffs seek reimbursement for liability imposed in the employee actions, be commenced against the present defendants in *state* court as third-party claims. *See* Fla.R. Civ.P. 1.180 (twenty days after service of answer, defendant may join third-party defendant with leave of court).

Finally, FPL reasserts its ongoing complaint about alleged discovery abuses. The gist of this complaint appears to be that the defendants' alleged refusal to comply with discovery obligations prevented FPL from defending against the present motion. *See* FPL's Memorandum in Opposition to Defendants' Motion for Summary Judgment, at 2–4 (Oct. 5, 1989). Upon review, the court concludes: (1) that any abuse committed by the defendants was certainly of no greater magnitude than that committed by FPL itself, *see* Magistrate's Report and Recommendation (Dec. 27, 1989) (noting that "FPL has been tardy in producing the discovery in question without a completely satisfactory excuse and to the possible detriment of the defendants. . . ."), *adopted in full per* Order (Jan. 31, 1990); and (2) that any harm flowing from the defendants' conduct did not in any way impair FPL's ability to defend against the present motion.

DONE AND ORDERED.