BOWEN ENGINEERING and Niro Atomizer Acquisition Co., Inc., Plaintiffs,

v.

The ESTATE OF Ralph T. REEVE and the Reeve Co., Defendants.

Civ. No. 89–2649 (AET).

United States District Court, D. New Jersey.

Sept. 17, 1992.

David Sweet (Kathleen M. McLeod, on brief), Collier, Jacob & Sweet, Somerset, N.J., for plaintiffs.

William W. Lanigan, Bedminster, N.J., for defendants.

## AMENDED OPINION

ANNE E. THOMPSON, District Judge.

This matter comes before the court on a motion for summary judgment by defendant, the Estate of Ralph T. Reeve, and on a cross-motion by plaintiffs for summary judgment on Counts One and Two of the complaint and defendant's counterclaim. Both parties also seek sanctions under Rule 11 of the Federal Rules of Civil Procedure.

Plaintiffs Bowen Engineering and Niro Atomizer Acquisitions Company, Inc. are former owners of a facility at North Branch, New Jersey which was used as a test laboratory. The property was purchased by Bowen Engineering in July of 1949. Def.Ex. 9; Pl.Ex. N, July 19, 1949 Minutes at 4. Until 1974, Ralph T. Reeve, now deceased, was president and a director of Bowen. He was also a director and 40% stockholder of the Reeve Company, which owned all of Bowen's stock. In May of 1974 the Reeve Company sold its shares in Bowen to Stork–InterAmerica Corp., resulting in the formation of Stork Bowen Engineering. Stork Bowen continued operations at the North Branch site until 1976, and sold the site in 1977 to an entity which is not a party to this action. Stork Bowen was purchased by Niro in 1982.

Beginning in 1982, the New Jersey Department of Environmental Protection ("DEP") made inquiries into the possibility

of soil and water contamination at the North Branch facility. Tests were taken between 1982 and 1987 which proved inconclusive. In 1989 the DEP took soil, water and stream sediment samples at the site which indicated the presence of certain hazardous substances in excess of DEP limitations. In anticipation of possible future cleanup costs, plaintiffs filed this suit to obtain a declaratory judgment holding Mr. Reeve, through his estate, liable under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675[1] (Count One). Plaintiffs also seek recovery under the New Jersey Spill Compensation and Control Act ("the Spill Act"), N.J.S.A. § 58:10–23.11 to 23.11z (Count Two) and various state common law claims (Counts Three through Eight). Defendant raises a counterclaim for indemnification.

A court may enter summary judgment under Federal Rule of Civil Procedure 56(c) when the moving party demonstrates (1) that there is no genuine issue of material fact, and (2) that the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once the moving party has satisfied this initial burden, the opposing party must establish that a genuine issue exists. *Jersey Central Power & Light Co. v. Lacey Township,* 772 F.2d 1103, 1109 (3d Cir.1985), *cert. denied* 475 U.S. 1013, 106 S.Ct. 1190, 89 L.Ed.2d 305 (1986). Not every issue of fact will be sufficient to defeat a motion for summary judgment; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Further, the opposing party cannot rest upon mere allegations; it must present actual evidence that creates a genuine issue of material fact. *Id.* at 249, 106 S.Ct. at 2510 (citing *First Nat'l Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)). The court must draw all reasonable inferences in the opposing party's favor, and must accept that party's evidence when considering the merits of the summary judgment motion. *See Pollack v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986).

Defendant has objected to the introduction of certain certifications submitted in opposition to the Estate's motion and in support of plaintiffs' cross-motion. Def. Opposition Brief at 10–19. Since the court does not rely on any of these certifications in order to reach its conclusions, we need not consider the admissibility of this evidence.

## I. PLAINTIFFS' CLAIM UNDER CERCLA

In Count One plaintiffs seek to hold defendant liable under CERCLA for any cleanup costs associated with releases or threatened releases of hazardous materials due to the activities which occurred on the North Branch site between July of 1949 and May of 1974. Both parties now seek summary judgment on this claim.

Under CERCLA,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of ... shall be liable for

(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release.

§ 9607(a). CERCLA may be applied to releases which occurred prior to its enactment in 1980. *Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784, 790 (D.N.J.1989). "[T]he overarching goal of CERCLA is to place the financial

---

**1.** All statutory references will be to 42 U.S.C. unless otherwise indicated.

cost of the cleanup upon those parties responsible for creating the hazardous condition." *Amland* at 789 (citing, among other cases, *Lone Pine Steering Comm. v. EPA*, 777 F.2d 882, 886 (3d Cir.1985), *cert. denied*, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986)).

## A. Liability Under CERCLA

■ To establish liability under CERCLA, plaintiffs must prove the following four elements:

(1) the site is a "facility";

(2) defendant falls within at least one of the four classes of "responsible persons" listed in § 9607(a).

(3) there has been a "release" or "threatened release" of a hazardous substance from the site; and

(4) plaintiffs have incurred response costs due to the release or threatened release.

*United States v. Kramer*, 757 F.Supp. 397, 417 (D.N.J.1991) (citing *United States v. Aceto Agric. Chems. Corp.*, 872 F.2d 1373, 1378–79 (8th Cir.1989)); *Southland Corp. v. Ashland Oil, Inc.*, 696 F.Supp. 994, 999 (D.N.J.1988); *T & E Indus., Inc. v. Safety Light Corp.*, 680 F.Supp. 696, 708 (D.N.J. 1988); *see New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 (2nd Cir.1985) (government entity as plaintiff). As discussed below, plaintiffs have proven liability under CERCLA.

### 1. The North Branch site as a "facility"

■ A "facility" is defined under CERCLA as "(A) any building, structure, installation, equipment, pipe or pipeline ..., well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located...." § 9601(9). It is clear that the North Branch site falls within the list of locales or items qualifying as facilities. Further, the evidence indicates that "a hazardous substance has ... come to be located" at the site. The testing which occurred at the site involved the use of solvents which included benzene, toluene, xylene and methylene chloride. Pl.Ex. J, April 17, 1989 Report of New Jersey Dept. of Environmental Protection ("DEP") at 1. These substances are all considered to be "hazardous materials" under CERCLA. 40 C.F.R. § 302.4 Table 302.4.[2] Further, according to the testimony of Harman DuMont, an employee at the North Branch site during the time that Mr. Reeve maintained an ownership interest in Bowen Engineering,[3] some waste from the testing process performed at the facility was released into a drainage system located under the floor of the testing facility. *See, e.g.*, Pl.Ex. M, DuMont Deposition Transcript at 83–84. Other waste water was placed into facility's septic system, *id.* at 65–67, and leaching pit, *id.* at 101. Thus the North Branch site is a "facility" within the meaning of § 9601(9).

### 2. Defendant as a "responsible person"

■ A liable person under CERCLA includes "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." § 9607(a)(2). An individual who has "the *authority* to control the handling and disposal of hazardous substances" is an "owner or operator" under § 9607(a)(2). *United States v. Northeastern Pharm. & Chem. Co., Inc. ("NEPACCO II")*, 810 F.2d 726,

---

**2.** Under CERCLA, a "hazardous substance" includes "any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title." § 9601(14). § 9602(a) requires the Administrator of the Environmental Protection Agency to issue regulations which list substances to be considered hazardous under the act. The table of hazardous substances located at 40 C.F.R. § 302.4 contains a list of hazardous substances generated by the agency in response to its mandate under § 9602(a).

**3.** Mr. DuMont began his employment at Bowen Engineering in 1950 as a lab technician at the North Branch facility. Pl.Ex. M, DuMont Deposition at 15–16. In the late 1950s Mr. DuMont was transferred to a facility in Somerville, but he returned to the North Branch laboratory from 1967 until 1978. *Id.* at 16.

743 (8th Cir.1986) (emphasis added), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987). Thus in *NEPACCO II* the appellate court found that a plant supervisor was liable because he "actually knew about, had immediate supervision over, and was directly responsible for arranging for the transportation and disposal of the ... plant's hazardous substances...." *Id.* A stockholder who does not participate in the management of the facility is not an "owner or operator." § 9601(20)(A); *Shore Realty*, 759 F.2d at 1052. A stockholder can be an "owner or operator," however, if he is active in the facility's management. *Shore Realty* at 1052; *see* § 9601(20)(A). Further, "a corporate officer who has direct responsibility for arranging for the disposal of hazardous waste is personally liable under the provisions of CERCLA." *United States v. Northernaire Plating Co.*, 670 F.Supp. 742, 747 (W.D.Mich.1987), *aff'd sub nom. United States v. R.W. Meyer, Inc.*, 889 F.2d 1497 (6th Cir.1989), *cert. denied*, 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990); *cf. Mobay Corp. v. Allied–Signal, Inc.*, 761 F.Supp. 345, 354 (D.N.J.1991) (parent corporation actively involved in the management of subsidiary is liable under CERCLA).

■ Ralph Reeve was not only a major shareholder in Bowen's parent company; he was also president and a director of both Bowen and the Reeve Company. Minutes taken during meetings of Bowen's board of directors indicate that Mr. Reeve was an active president directly involved in the management of the company. *See generally* Pl.Ex. N. His active control included direct involvement in issues related to the management of the North Branch site. For example, Mr. Reeve reported to the board on changes in the testing facility's air pollution controls. *Id.*, June 3, 1966 Minutes at 4; *see also id.* at 6 (discussion of land usage at site). This impression of Ralph Reeve as an active manager is borne out by the testimony of Mr. DuMont, who described Mr. Reeve as a "hands-on manager" who ran the day-to-day affairs of the company. DuMont Tr. at 64. As Mr. DuMont explained, "[i]n a small company [Mr.

Reeve] would have approval, you know, of everything that went on. This was a small company...." *Id.* at 63–64. While Ralph Reeve was not the on-site supervisor at North Branch, he visited the facility approximately once a week during the 1950s and once a month between 1967 and 1976. *Id.* at 85–86. Thus, Mr. Reeve's control of overall operations at Bowen and his active participation in the North Branch site qualifies him as an "operator" for purposes of CERCLA.

Defendant argues that deceased individuals, their estates and their heirs, administrators and executors are not liable under CERCLA, which defines a "person" as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." § 9601(21). Since there is no provision under federal law which addresses the liability of a decedent's estate under CERCLA, defendant reasons, New Jersey's survival statute, N.J.S.A. § 2A:15–4, which limits the survivability of a claim upon death of the tortfeasor, requires this court to conclude that the Estate is not amenable to suit under CERCLA.

■ Initially, the court notes that defendant has waived any defense based on the survival statute. N.J.S.A. § 2A:15–4 limits the capacity of a decedent's estate to be sued. Federal Rule of Civil Procedure 9(a) states in relevant part:

> When a party desires to raise an issue as to the legal existence of any party or the capacity of any party to sue or be sued ... the party desiring to raise the issue shall do so by specific negative averment, which shall include such supporting particulars as are peculiarly within the pleader's knowledge.

Thus, a challenge to a party's capacity to sue or be sued is an affirmative defense, and failure to raise the defense results in its waiver. *MTO Maritime Transport Overseas, Inc. v. McLendon Forwarding Co.*, 837 F.2d 215, 218 (5th Cir.1988); *Gar-*

*bincius v. Boston Edison Co.*, 621 F.2d 1171, 1174 (1st Cir.1980).

 Liability under CERCLA is to be liberally applied. *3550 Stevens Creek Assocs. v. Barclays Bank of California*, 915 F.2d 1355, 1363 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991); *First United Methodist Church of Hyattsville v. U.S. Gypsum Co.*, 882 F.2d 862, 867 (4th Cir.1989), *cert. denied*, 493 U.S. 1070, 110 S.Ct. 1113, 107 L.Ed.2d 1020 (1990); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir.1986). The provisions of § 9607(a), including the definition of a "person," must be read broadly to impose the costs of cleanup upon those responsible for the release of hazardous materials. *Dedham*, 805 F.2d at 1074; *Shore Realty*, 759 F.2d at 1045; *United States v. Sharon Steel Corp.*, 681 F.Supp. 1492, 1496 (D. Utah 1987). Thus in *Sharon Steel* the district court imposed liability against a liquidating trust which existed for the purpose of winding up the affairs of a dissolved corporation. 681 F.Supp. at 1495–98. Liability was imposed even though a liquidating trust was not listed as a "person" under § 9601(21). Similarly, several courts have held that a bankruptcy estate is liable for cleanup costs under CERCLA. *In re Hemingway Transport, Inc.*, 73 B.R. 494, 499 (Bankr.D.Mass.1987), *aff'd in relevant part*, 126 B.R. 656 (D.Mass.1991), *aff'd*, 954 F.2d 1 (1st Cir.1992); *In re T.P. Long Chem., Inc.*, 45 B.R. 278, 284 (Bankr. N.D. Ohio 1985); *cf. In re Stevens*, 68 B.R. 774, 779 (D.Me.1987) (holding bankruptcy estate liable under CERCLA without discussion of estate's status as a person). Accordingly, we agree with plaintiffs that a decedent's estate may be held liable for cleanup costs.

3. Release or threatened release of hazardous materials at the site

 There was also a "release" or "threatened release" of a hazardous substance at the site. Residual solids from the spray testing process were collected in settling tanks and placed in the leaching field.

Pl.Ex. J, DEP report at 1. "Although the rinsate entering this system was considered by Bowen to be nonhazardous, analysis of sludge and water present in this leaching pit revealed elevated levels of heavy metals and volatile organic contaminants." *Id.* Soil samples taken at the site near the leaching pit contained polycyclicaromatic hydrocarbons and semi-volatile compounds. *Id.* at 3–4. These samples also contained arsenic, barium, cadmium, chromium, cobalt, copper, lead, mercury, nickel, selenium and zinc "at quantities above the NJDEP proposed soil action/cleanup levels." A soil sample taken from the leaching pit in 1986 had also revealed "high levels of some organic solvents and heavy metals." *Id.* The DEP concluded that the presence of these hazardous substances was probably due to Bowen's testing activities.

"Since the integrity of [the leaching pit] is questionable, soil contamination from this source can be assumed. Soil contamination from the distribution box, leaching field and holding and settling tanks is possible; however, the exact locations and depths of theses [sic] areas are unknown. The capped pipe area and underground unit to the west may also be sources of possible contamination." *Id.* Further, Mr. DuMont testified that the leaching pit overflowed on a limited number of occasions, DuMont Tr. at 73–74, and that material[4] was mistakenly pumped into the leaching pit instead of a storage tank on a handful of occasions. *Id.* at 34–35, 42–43. Based on this evidence, at a minimum there was a "threatened release" of hazardous material at the North Branch site.

 Defendant argues that it cannot be held responsible for any such release or threatened release because plaintiffs have not shown that Ralph Reeve was at fault or that his actions were otherwise responsible for any release or threatened release. Plaintiffs, however, need not prove negligence or any level of fault, since CERCLA imposes strict liability. *E.g., General Elec. Co. v. Litton Indus. Automation Systems,*

---

**4.** The testimony does not indicate whether this accidental release involved hazardous material.

*Inc.,* 920 F.2d 1415, 1418 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991); *United States v. Monsanto Co.,* 858 F.2d 160, 167 (4th Cir. 1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); *Shore Realty,* 759 F.2d at 1042; *Kramer,* 757 F.Supp. at 419; *Southland,* 696 F.Supp. at 1000.

### 4. Plaintiffs' response costs

▓▓ Plaintiffs have established that they incurred some expenses in response to the release or threatened release of hazardous materials. To date, there have been no cleanup efforts at the site. However, plaintiffs have spent several thousand dollars in assessment and monitoring costs. Pl.Ex. C (bills for expenses incurred at the North Branch site). These costs are recoverable under CERCLA. *Artesian Water Co. v. New Castle County,* 851 F.2d 643, 651 (3d Cir.1988). Although plaintiffs' costs to date have been minimal, there is no requirement that they reach some threshold level of expenses. "[O]nce some expenditure has been made, the controversy is sufficiently real to permit the court to issue a declaratory judgment on defendant's liability." *Jones v. Inmont Corp.,* 584 F.Supp. 1425, 1430 (S.D. Ohio 1984).

▓▓ Defendant argues that plaintiffs cannot recover because there is no evidence that a cleanup will be required under CERCLA. However, a plaintiff can receive a declaratory judgment under CERCLA on the strength of monitoring and assessment costs, even if plaintiffs have not yet incurred any cleanup costs. *Artesian Water Co.,* 851 F.2d at 651; *Southland,* 696 F.Supp. at 1003. Plaintiffs may receive all necessary "response" costs associated with a release or threatened release of hazardous materials. § 9607(a)(4)(B). " '[R]esponse' means remove, removal, remedy, and remedial action." § 9601(25). "Removal" includes "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances...." § 9601(23). Thus, CERCLA anticipates that monitoring and assessment costs are recoverable response costs. *Inmont,* 584 F.Supp. at 1429.

### B. *Declaratory Relief*

▓▓ Declaratory judgment is an appropriate remedy under CERCLA where it is not yet possible to determine the actual costs of the cleanup. *United States v. Hardage,* 733 F.Supp. 1424, 1439 (W.D.Okla.1989); *O'Neil v. Picillo,* 682 F.Supp. 706, 730 (D.R.I.1988), *aff'd,* 883 F.2d 176 (1st Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990); *United States v. Northeastern Pharm. & Chem. Co. ("NEPACCO I"),* 579 F.Supp. 823, 852 (W.D.Mo.1984), *aff'd in part and rev'd in part,* 810 F.2d 726 (8th Cir.1986), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *see also Southland,* 696 F.Supp. at 999; *T & E Indus.,* 680 F.Supp. at 708. Here, as discussed above, there have not yet been any cleanup efforts at the North Branch facility. Thus, plaintiffs' CERCLA-related costs are not currently determinable. Having met their burden of proving the four elements necessary for a finding of liability under CERCLA, plaintiffs therefore are entitled to a declaratory judgment as to defendant's liability.

▓▓ Defendant claims that plaintiffs should be barred from recovery under the doctrine of laches, since they knew about the DEP's interest in the site as early as 1982. Defendant asserts that it is inequitable for plaintiffs to file their lawsuit after Mr. Reeve's death in 1988, since he might have had unique access to information for use in his defense. In order to assert the equitable defense of laches, defendant must establish "(1) lack of diligence by the party against whom the defense is asserted [in pursuing its claim], and (2) prejudice to the party asserting the defense." *Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961); *see also Benoit v. Panthaky,* 780 F.2d 336, 339 (3d Cir.1985). Here, it was not clear that plaintiffs had a claim under CERCLA until the DEP issued its report in April of 1989. Prior to that date, the evidence regarding possible CERCLA liability at the North Branch facility was inconclusive at best.

Therefore, it cannot be said that plaintiffs pursued their claim with lack of diligence.[5]

Defendant cites to *Cook v. Rockwell Int'l Corp.*, 755 F.Supp. 1468 (D.Col.1991) for the proposition that CERCLA does not allow for prospective relief. *Cook* states that "CERCLA allows recovery only of costs that have been incurred by a plaintiff before judgment." *Id.* at 1473. To the extent that *Cook* suggests that declaratory judgment is an improper form of relief under CERCLA, this court chooses to follow the more established position that declaratory judgment is appropriate under the act. Further, *Cook* is not necessarily inconsistent with the relief sought by plaintiffs, since a declaratory judgment on liability is not the same as a final judgment. The court could maintain jurisdiction in order to determine damages at an appropriate date.

 The Estate also argues that plaintiffs are not entitled to any relief because their efforts to date have not complied with the requirements of the National Contingency Plan ("NCP"). In order to recover any actual costs, plaintiffs would have to prove compliance with the NCP. *See Amland*, 711 F.Supp. at 790. However, " 'the detailed NCP provisions governing other response actions cannot reasonably be applied to preliminary monitoring and evaluation of a release of hazardous substances.' " *Id.* at 795 (quoting *Artesian Water Co. v. New Castle County*, 659 F.Supp. 1269, 1294 (D.Del.1987)); *Southland*, 696 F.Supp. at 999–1000; *cf. County Line Inv. Co. v. Tinney*, 933 F.2d 1508, 1513 (10th Cir.1991) (declaratory judgment may be appropriate under CERCLA even though compliance with NCP not yet proven).

 Finally, defendant claims that there is no evidence that any release occurred during Ralph Reeve's tenure at Bowen. As discussed above, there is evidence that releases or threatened releases of hazardous materials occurred while Mr. Reeve was the president and a major share-holder at Bowen Engineering. *See* Dumont Tr. at 34–35, 42–43, 73–74. Defendant asserts that some or all of the contamination stemmed from sources for which defendant cannot be held liable. For example, defendant argues that there may have been releases during the two years after Mr. Reeve sold his interest in Bowen Engineering, when plaintiffs continued to operate the testing facility at the North Branch site. Further, the Estate contends that off-site sources may have been responsible for the presence of some or all of the hazardous materials. However, defendant offers no evidence which would establish that either plaintiffs or third parties were responsible for a release of hazardous materials. Defendant has only presented allegations, highly conjectural in nature, which are insufficient to defeat a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510.

Plaintiffs' cross-motion asks for summary judgment on Count One. At this point in time, plaintiffs are only entitled to partial summary judgment limited to a finding of liability, since there is insufficient information to determine final clean-up costs. "[W]hile the need for a factual determination on specific costs would preclude summary judgment on the issue of damages at this stage, this is not the result when the request is for a declaration of liability." *Southland*, 696 F.Supp. at 1000; *see also T & E Indus.*, 680 F.Supp. at 709.

 Plaintiffs' entitlement to summary judgment is further limited to environmental damages occurring between July of 1949 and May of 1974. Since Ralph Reeve ceased to be an operator when he sold his interest in Bowen, plaintiffs cannot satisfy the "responsible person" element of CERCLA liability for any release of hazardous materials after the sale date in May of 1974. Similarly, Mr. Reeve did not become an operator until Bowen Engineering purchased the North Branch facility in 1949. Thus, plaintiffs are entitled to judgment on liability only for releases during the period

---

5. For the same reasons, the court rejects defendant's arguments under the doctrine of laches in relation to plaintiffs' other claims.

1949 to 1974. This limitation on defendant's liability is consistent with the purpose of CERCLA "to place the financial cost of the cleanup upon those parties responsible for creating the hazardous material." *Amland*, 711 F.Supp. at 789.[6] CERCLA is not meant to impose *all* liability for the costs of cleanup on a person who is only *partially* responsible for the release of hazardous materials.

Having established that defendant is liable for the release or threatened release of hazardous materials during the time that Ralph Reeve was an operator of the North Branch facility, plaintiffs are entitled to partial summary judgment on Count One. Therefore, the court will grant judgment to plaintiffs on the issue of liability for cleanup costs associated with the release or threatened release of hazardous materials at the North Branch facility between July of 1949 and May of 1974.

## II. PLAINTIFFS' CLAIM UNDER THE NEW JERSEY SPILL ACT

Both parties also move for summary judgment on Count Two of plaintiffs' complaint, which alleges violation of the New Jersey Spill Act. Plaintiffs seek to recover past and future costs incurred under the Spill Act in the cleanup of the North Branch site, as well as a "permanent injunction compelling defendants to perform all work required to remove any hazardous substances remaining at the North Branch Site."

▮▮ Under section 8 of the act, N.J.S.A. § 58:10–23.11g(c), persons responsible for the discharge of hazardous substances are strictly liable to the DEP, jointly and severally, for all cleanup and removal costs. "The Spill Act does not provide a private right of action for recovery of cleanup costs and other damages." *Allied Corp. v. Frola ("Frola I")*, 701 F.Supp. 1084, 1091

(D.N.J.1988); *T & E Indus.*, 680 F.Supp. at 703; *Jersey City Redevelopment Auth. v. PPG Indus.*, 655 F.Supp. 1257, 1263 (D.N.J. 1987).

Plaintiffs seek to recover expenses which they voluntarily incur under section 7 of the act, N.J.S.A. § 58:10–23.11f(a). Section 7 is intended to address cleanup of hazardous substances by the DEP, but it also provides that "[n]othing in this section is intended to preclude removal and cleanup operations by any person threatened by such discharges, provided such persons coordinate and obtain approval for such actions with ongoing State or federal operations." Further, section 7(f) provides that "[a]ny expenditures made by the administrator pursuant to this act shall constitute in each instance, a debt of the discharger to the fund." Since this section authorizes both the state and private parties to clean up hazardous substances, plaintiffs reason, private parties should be able to recoup their losses in the same manner provided for the state.

This district, in an analysis which we adopt, has previously rejected the argument raised by plaintiffs. *Jersey City Redevelopment Auth.* at 1262–63. Section 7 authorizes action by the DEP. While it does not bar cleanup efforts by private parties, neither does it empower individuals to act. Thus section 7 does not create a private right to recover cleanup costs, either alone or in concert with section 8. *Id.*

▮▮ Neither does the Environmental Rights Act ("ERA"), N.J.S.A. §§ 2A:35A–1 to –14, provide plaintiffs with a private right to recover cleanup costs under the Spill Act. N.J.S.A. § 2A:35–4(a) permits any person to "commence a civil action in a court of competent jurisdiction against any other person alleged to be in violation of any statute, regulation or ordinance which is designed to prevent or minimize pollu-

---

6. The court's finding of limited liability is also consistent with § 9613(f)(1), which states that "[a]ny person may seek contribution from any other person who is liable *or potentially liable* under section 9607(a) of this title...." *See Kramer*, 757 F.Supp. at 412–13. While defendant has failed to produce evidence that there was a release or threatened release of hazardous

materials between 1974 and 1976, when testing ceased at the site, the fact that plaintiffs continued to operate the testing facility for approximately two years raises the possibility that spills occurred during their tenure. *See* DuMont Tr. at 42–43 (errors in waste disposal occurred at least twice *prior to 1976*).

tion, impairment or destruction of the environment." While the ERA generally allows for citizen enforcement of state environmental laws, it does not create any independent substantive rights. *Frola I*, 701 F.Supp. at 1091; *Superior Air Products Co. v. NL Indus., Inc.*, 216 N.J.Super. 46, 58, 522 A.2d 1025 (App.Div.1987). Since plaintiffs' rights under the ERA are derivative of their rights under the Spill Act, and since the Spill Act does not provide for private recovery of cleanup costs, the ERA does not allow for the recovery of such costs. *Frola I* at 1091.

■ Although the Spill Act does not have a provision for enforcement by private parties, citizens may bring an action through the ERA for injunctive relief under the Spill Act. *See id.; Port of Monmouth Dev. Corp. v. Middletown Township*, 229 N.J.Super. 445, 451, 551 A.2d 1030 (App.Div.1988), *cert. denied*, 115 N.J. 59, 556 A.2d 1206 (1989). An action brought under the ERA "may be for injunctive or other equitable relief to compel compliance with a statute, regulation or ordinance, or to assess civil penalties for the violation as provided by law." N.J.S.A. § 2A:35A–4(a). However, the right of a private actor to sue under the ERA is limited. The action must be "commenced upon an allegation that a person is in violation, either continuously or intermittently, of a statute, regulation or ordinance, and that there is a likelihood that the violation will recur in the future." *Id.* Any violation of the Spill Act for which Ralph Reeve was responsible occurred no later than May of 1974, when he sold his interest in Bowen Engineering. Defendant is not in continuing violation of the Spill Act, and there is no likelihood that decedent will be responsible for future violations. Accordingly, plaintiffs do not have a cause of action against this defendant to seek injunctive or other equitable relief under the Spill Act through the ERA.

While not raised by either party during the pendency of this action, section 7 of the Spill Act was recently amended to provide a right of contribution among joint tortfeasors. 1991 N.J.Pub.L. 373 (approved Jan. 10, 1992). We will therefore consider whether this change in the law is applicable to this action. The amendment reads in pertinent part:

(2) Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance. In an action for contribution, the contribution plaintiffs need prove only that a discharge occurred for which the contribution defendant or defendants are liable pursuant to the provisions of [N.J.S.A. § 58:10–23.11g(c)], and the contribution defendant shall have only the defenses to liability available to parties pursuant to [N.J.S.A. § 58:10–23.11g(d)]. In resolving contribution claims, a court may allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate.

§ 58:10–23.11g(c) states that "[a]ny person who has discharged a hazardous substance or is in any way responsible for any hazardous substance which the department has removed or is removing pursuant to [§ 58:10–23.11f(b)] shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs." Defenses against this strict liability are limited to "[a]n act or omission caused solely by war, sabotage, or God, or a combination thereof." § 58:10–23.11g(d).

■ As a general rule, changes to statutory law in New Jersey are applied prospectively rather than retroactively. *Twiss v. New Jersey Dept. of the Treasury*, 124 N.J. 461, 466, 591 A.2d 913 (1991); *Gibbons v. Gibbons*, 86 N.J. 515, 521, 432 A.2d 80 (1981). Nonetheless a statute will be applied retroactively under certain conditions. *Twiss*, 124 N.J. at 467, 591 A.2d 913; *Gibbons*, 86 N.J. at 522, 432 A.2d 80. Three exceptions are recognized; "when the Legislature has expressed its intent, either explicitly or implicitly, that the statute should

be so applied; when the statute is curative [or ameliorative]; or when the reasonable expectations of those affected by the statute warrant such application." *Twiss*, 124 N.J. at 467, 591 A.2d 913; *see Gibbons*, 86 N.J. at 522–23, 432 A.2d 80.

There is no indication that the legislature intended the amendment to be applied retroactively. The legislative history, however, makes clear that the statute was intended to be curative. "The 'curative' exception comes into play when a statute amends a previous law which is unclear or which does not effectuate the actual intent of the Legislature in adopting the original act." *Fasching v. Kallinger*, 227 N.J.Super. 270, 274, 546 A.2d 1094 (App.Div.1988); *see also Kendall v. Snedeker*, 219 N.J.Super. 283, 287, 530 A.2d 334 (App.Div.1987). Thus in *Gibbons* the court found that a statute was curative where "it reflect[ed] the Legislature's attempt to improve a statutory scheme already in existence." 86 N.J. at 524, 432 A.2d 80.

■ The amendment at issue here was drafted because recent case law cast doubt on "the right to contribution under New Jersey common law" and because "the Spill Act [as it then existed did] not contain a provision that clearly provides for the right of contribution." New Jersey Senate Environmental Quality Committee Statement to Senate Committee Substitute for Senate, No. 2657 and Assembly, No. 3659 [enacted as 1991 N.J.Pub.L. 372] at 1 (Dec. 10, 1990); *see also* Statement to Senate, No. 2657 at 6 (May 17, 1990); Statement to Assembly, No. 3659 at 6 (June 11, 1990). The amendment was meant to remove this uncertainty which had led to reluctance on the part of polluters to reach cleanup agreements with the DEP. *Id.* Since the amendment is curative in nature, it should be applied retroactively.

■ A person responsible for the discharge of a hazardous substance is only liable under § 58:10–23.11g(c) if the DEP "has removed or is removing" the hazardous material. DEP activity at the facility has been limited to investigation into the

extent of contamination. The contribution plaintiff may seek contribution only if the "contribution defendant or defendants *are liable* pursuant to the provisions of subsection c. of section 8." Thus, a claim for contribution would be premature at this stage in the history of the DEP's intervention at the North Branch site. Plaintiffs, therefore, are not entitled to contribution.

Based on the court's analysis under sections 7 and 8 of the Spill Act, as amended and as applied in light of the ERA, the Estate is entitled to judgment on Count II, and plaintiffs' motion for summary judgment will be denied.

### III. PLAINTIFFS' STATE COMMON LAW CLAIMS

Defendant seeks summary judgment on plaintiffs' remaining counts, which consist of various state common law causes of action. Plaintiffs concede that defendant is entitled to summary judgment on Count Four (Private Nuisance) and Count Five (Public Nuisance) in light of *Amland*, 711 F.Supp. 784 (D.N.J.1989). Further, since plaintiffs have not served their complaint on the Reeve Company (which has been dissolved since 1974), defendant is entitled to summary judgment on Count Eight, which alleges that "Ralph T. Reeve is liable for the claims against The Reeve Company up to the amount of the Distributed Assets he received." Thus, the court will grant summary judgment on these counts.

Three counts remain for the court's consideration. Count Three seeks to hold defendant strictly liable on the theory that the activities at the site were ultrahazardous. Count Six alleges that Ralph Reeve acted negligently in the handling of hazardous material, and Count Seven presents a claim of fraudulent nondisclosure concerning a material defect in the property.

#### A. *Statute of Limitations*

■ Initially, defendant asserts that these three counts should be dismissed as time-barred under the applicable six-year statute of limitations, N.J.S.A. § 2A:14–1.[7]

---

**7.** The court has already addressed defendant's

arguments that these claims should be barred

"[A]t least in an environmental contamination case, a cause of action accrues in New Jersey when a plaintiff knows or reasonably should know of his or her cause of action and of the identity of a party or parties who may be responsible for the injury, in this case the dumping of hazardous substances on land."

*Allied Corp. v. Frola ("Frola II")*, 730 F.Supp. 626, 632 (D.N.J.1990) (analyzing conflicting case law). There is no issue that plaintiffs could have identified Ralph Reeve as a "responsible person" in 1982. The Estate argues that these causes of action arose in 1982, when the DEP first inquired into the possibility of contamination at the North Branch facility. This would date plaintiffs' knowledge, whether actual or constructive, more than six years before the date they filed their complaint on June 12, 1989. Plaintiffs assert that they could not have discovered their claims until April of 1989, when the DEP issued its first report indicating excess levels of certain hazardous substances at the site.

Under the facts of this case, the DEP's initial investigation of the North Branch site did not put plaintiffs on notice that they had any of the three causes of action remaining for consideration. Early test results were inconclusive at best, with no indication that the site was contaminated. *See generally* Pl.Ex. 3, 8. Plaintiffs were instructed by the DEP in January of 1989 to empty out storage and septic tanks on the property. However, the contents of these tanks do not form plaintiffs' main allegations. The complaint is centered on the presence of hazardous material in the leaching pit. This fact did not come to light until the DEP prepared its report in April of 1989, less than two months before plaintiffs filed their complaint. Thus, the complaint was filed in a timely fashion under the applicable statute of limitations.

### B. *Count Three—Abnormally Dangerous Activity*

■ Plaintiffs seek to impose strict liability on defendant under the theory that the testing which took place at the North Branch facility was an ultrahazardous activity. *See T & E Indus. v. Safety Light Corp.*, 123 N.J. 371, 386, 587 A.2d 1249 (1991). In order to determine whether an activity is abnormally dangerous, the court must consider the following six factors:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

*Id.* at 390, 587 A.2d 1249 (quoting Restatement (Second) of Torts § 520). These factors should be applied on a case-by-case basis. *Id.* at 391, 587 A.2d 1249. This matter presents several issues of material fact, with the result that summary judgment would be inappropriate at this time. For example, since there is insufficient evidence to determine exactly what hazardous materials were tested and disposed of at the facility, we cannot assess the degree of risk created by the testing. Similarly, the court cannot judge the appropriateness of the activity to its location, since the parties have not established with any certainty how neighboring pieces of property were used. Accordingly, defendant's motion will be denied as it applies to Count Three.

■ Even if Bowen's activities at the site qualify as ultrahazardous, defendant argues, plaintiffs voluntarily "assumed the risk" of the activity, and the Estate should not be held liable under Count Three. "A buyer can assume the risk of harm from an abnormally-dangerous activity. To do so a buyer need only knowingly and voluntarily encounter the risk." *Id.* at 390, 587 A.2d 1249 (citing Restatement (Second) of Torts § 523 (1977)). There must be a clear assumption of the risk; the seller will not be

by the doctrine of laches and by New Jersey's survival statute.

excused where "a party, ignorant of the presence of an abnormally dangerous condition, ... merely ... sign[s] an 'as is' purchase contract." *Amland*, 711 F.Supp. at 803 n. 20; *see also T & E Indus.*, 123 N.J. at 390, 587 A.2d 1249. "A real-estate contract that does not disclose the abnormally-dangerous condition or activity does not shield from liability the seller who created that condition or engaged in that activity." *T & E Indus.*, 123 N.J. at 390, 587 A.2d 1249.

Assumption of the risk is further explained in the Comments to the Restatement (Second) of Torts:

> As in other situations involving assumption of risk, the plaintiff does not assume the risk unless he knows of its existence. The risk inseparable from the great majority of abnormally dangerous activities is, however, a matter of such common knowledge and general notoriety that, in the absence of special circumstances, as when he has been misled by the defendant or when he is too young to appreciate the risk, a plaintiff may often be found to have the knowledge notwithstanding his own denial. *It is not necessary that he know or understand all of the causes or elements of the risk inseparable from the activity.* It is enough that he knows that there is an abnormal risk of serious harm, to which those who take part in the activity or come within its range will be subjected.

Restatement (Second) of Torts § 523 cmt. c (1977) (emphasis added). Further, "[t]he risk is commonly assumed by one who takes part in the activity himself...." *Id.* cmt. d. The courts must apply a subjective test to determine whether a plaintiff voluntarily assumed the risk, examining "what the particular plaintiff in fact sees, knows, understands and appreciates." Restatement (Second) of Torts § 496D cmt. c (1965). Thus assumption of the risk is a question of fact to be determined by the finder of facts. *Id.* cmt. e.

Unlike the situation facing the courts in *Amland* and *T & E Indus.*, this case does not involve a seller who merely purchased land through an "as is" contract. Here,

plaintiffs were aware of the testing which was performed at the North Branch site when they obtained title to the property through their purchase of Bowen Engineering. Indeed, they maintained the testing operation for approximately two years after acquiring the facility. Nor was this activity continued without knowledge of the methods utilized previously by Bowen during Ralph Reeve's tenure. The facility continued to be managed by the same individual—Mr. DuMont—who previously ran the testing laboratory. DuMont Tr. at 84–85. Plaintiffs used the same methods of waste water disposal. *Id.* at 26–27.

Nonetheless, it may be that plaintiffs were not aware of the actual danger present at the site (assuming that the testing was ultrahazardous). While plaintiffs may have become aware of the risks when they continued the testing after acquiring the property, there is insufficient information to determine their state of mind at the time that the site was actually acquired. Thus, defendant is not entitled to summary judgment based on plaintiffs' assumption of the risk.

## C. Count Six—Negligence

■ Count Six is based on the allegation that Ralph Reeve acted negligently in disposing of hazardous waste at the site. Plaintiffs have established that, at least occasionally, hazardous materials were negligently disposed of at the facility. *E.g.*, DuMont Tr. at 34–35, 42–43, 73–74. Generally, a vendor of land is not subject to liability for harm caused by a dangerous condition existing at the time that the vendee took possession. *Cogliati v. Ecco High Frequency Corp.*, 181 N.J.Super. 579, 585, 439 A.2d 91 (App.Div.1981), *aff'd*, 92 N.J. 402, 456 A.2d 524 (1983). However, there are exceptions to this rule, two of which arguably apply to the case at hand. First, a vendor is liable for any condition of which he has actual or constructive knowledge, until the vendee has a reasonable opportunity to discover the condition. *O'Connor v. Altus*, 67 N.J. 106, 114, 335 A.2d 545 (1975). Second, a vendor is liable for injuries stemming from a condition cre-

ated by the vendor. *Cogliati*, 181 N.J.Super. at 585, 439 A.2d 91.

■ It is not entirely clear whether Ralph Reeve is a vendor for purposes of vendor liability. Plaintiffs have not presented any evidence suggesting that Mr. Reeve was so aware of the day-to-day management of the testing facility that he would have known about accidents or mistakes at the site, let alone that he actually knew about the presence of hazardous materials. Thus, there is no genuine issue of material fact whether Mr. Reeve had actual knowledge or whether he had constructive knowledge through his position as operator. Similarly, there is no evidence suggesting that Mr. Reeve created the dangerous condition at the site, as distinct from Bowen Engineering.

Further, on a more general level, there is no evidence to support the contention that Ralph Reeve acted negligently in relation to the disposal of hazardous materials. Unlike a claim under the strict liability provisions of CERCLA, plaintiffs must show that the negligence is attributable to the actions of *this* defendant. It is not enough that Mr. Reeve was an "active" manager, or that he visited the facility on a weekly basis. There must be some causal connection between defendant's action and the harm to plaintiffs. *Kulas v. Public Serv. Elec. & Gas Co.*, 41 N.J. 311, 317, 196 A.2d 769 (1964). Thus, there is no genuine issue of material fact regarding defendant's liability under Count Six, and the Estate is entitled to judgment as a matter of law.

### D. *Count Seven—Fraudulent Nondisclosure*

■ In order to sustain a claim of fraudulent concealment by a vendor of land, plaintiffs must prove "the deliberate concealment or nondisclosure by the seller of a material fact or defect not readily observable to the purchaser, with the buyer relying upon the seller to his detriment." *Department of Envtl. Protection v. Ventron Corp.*, 94 N.J. 473, 503, 468 A.2d 150 (1983). In order for the concealment to be deliberate, the seller clearly must have

knowledge of the defect. There is no evidence suggesting that Ralph Reeve was actually aware of any contamination or of any fault in the hazardous waste disposal system. Accordingly, defendant is entitled to summary judgment on Count Seven.

## IV. DEFENDANT'S COUNTERCLAIM FOR INDEMNIFICATION

Both parties seek summary judgment on defendant's counterclaim, which asserts that the Estate is entitled to indemnification under Bowen's by-laws. N.J.S.A. § 14A:3-5(2) provides that corporations may indemnify a corporate agent for the costs and liabilities incurred during a judicial proceeding related to actions taken in good faith by that agent within the scope of his agency. In 1977, after the sale of the Reeve Company's interest in Bowen, but while Ralph Reeve was still on Bowen's board of directors, Bowen amended its by-laws to include the following clause:

> Any person who shall be or who has been involved in or who has been made a party to any claim, action, suit or proceeding by reason of the fact that he, his testator or his intestate is or was a director, officer or employee of the company, whether or not then in office, and his executor, administrator, and heirs shall be indemnified by the company against all costs and expenses, including attorneys' fees.... He shall have no right to reimbursement, however, in relation to matters as to which he has been adjudged liable to the company if he was derelict in the performance of his duty as director, officer or employee by reason of willful misconduct, bad faith, gross negligence or reckless disregard of the duties of his office or employment....

Pl.Ex. N, February 18, 1977 Minutes at 2. Defendant argues that this indemnification clause should be interpreted to require plaintiffs to indemnify the Estate for any award and all costs and fees incurred during the course of this action.

■ New Jersey law requires indemnification clauses to be interpreted under the rules governing contract construction. *Ramos v. Browning Ferris Indus. of South*

484

*Jersey, Inc.*, 103 N.J. 177, 191, 510 A.2d 1152 (1986). "When the meaning of the clause is ambiguous, however, the clause should be strictly construed against the indemnitee." *Id.*

Plaintiffs argue that the indemnification clause at issue cannot be read to cover liability under CERCLA. CERCLA was approved by Congress on December 11, 1980. Pub.L. 96–510, 94 Stat. 2781. § 9607(e)(1) states:

> No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator ... or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

In spite of the seemingly contradictory language contained in this provision, most courts have found that CERCLA permits *some* form of contractually distributed liability. *See AM Int'l, Inc. v. International Forging Equip.*, 743 F.Supp. 525, 529–30 (N.D. Ohio 1990) and cases cited therein. In *Southland*, this district found that § 9607 "does not abrogate the parties' contractual rights" to indemnify. 696 F.Supp. at 1000. Whereas it is not fatal that the indemnification clause in question predates the enactment of CERCLA, *id.* at 1001, "some clear transfer or release of future 'CERCLA-like' liabilities is required." *Id.*[8]

■ Plaintiffs argue that the indemnification clause at issue does not provide for a clear transfer of "CERCLA-like" liabilities. However, in *FMC Corp. v. Northern Pump Co.*, 668 F.Supp. 1285 (D.Minn.1987),

*appeal dismissed*, 871 F.2d 1091 (8th Cir. 1988), the court held that a pre-CERCLA indemnity clause which released a party from liability for "all claims, demands and causes of action" was sufficiently broad to encompass claims arising out of CERCLA. 668 F.Supp. at 1292. The court in *Southland* explicitly relied on this holding to explain what would constitute a "clear transfer or release of future 'CERCLA-like' liabilities." 696 F.Supp. at 1002. Thus *Southland* does not require explicit reference to environmental claims, as argued by plaintiffs, but rather requires explicit reference to the types of legal proceedings in which CERCLA-like claims would arise. Therefore the reference in Bowen's indemnification clause to "any claim, action, suit or proceeding" is broad enough to include CERCLA-like claims.

In New Jersey a party may receive indemnification "only if he or she is without fault *and* his or her liability is *purely* constructive, secondary or vicarious." *Frola II*, 730 F.Supp. at 639 (emphasis added) (citing, among other cases, *Adler's Quality Bakery, Inc. v. Gaseteria, Inc.*, 32 N.J. 55, 79–80, 159 A.2d 97 (1960)).

> "[S]econdary as distinguished from primary liability rests upon a fault that is imputed or constructive only, being based on some legal relation between the parties, or arising from some positive rule of common or statutory law or because of a failure to discover or correct a defect or remedy a dangerous condition caused by the act of one primarily responsible."

*Adler's*, 32 N.J. at 80, 159 A.2d 97 (quoting *Builders Supply Co. v. McCabe*, 366 Pa. 322, 77 A.2d 368 (1951)). Thus, under New Jersey law "[t]o be entitled to indemnifica-

---

**8.** Plaintiffs urge the court to follow the more restrictive position taken in *AM Int'l*, rather than the approach forwarded by Judge Clarkson S. Fisher in *Southland*. The court in *AM Int'l* found that § 9607(e)(1) nullified indemnification clauses in suits brought under CERCLA by the government, and allowed such clauses in private-action suits only when applied to persons not otherwise liable under CERCLA. 743 F.Supp. at 530. This court will follow the more prevalent position, which does not disturb contractual indemnification agreements in private

suits for contribution. *See, e.g., Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1459 (9th Cir.1986); *Central Ill. Pub. Serv. Co. v. Industrial Oil Tank & Line Cleaning Serv.*, 730 F.Supp. 1498, 1507 (W.D.Mo.1990); *Southland*, 696 F.Supp. at 1000.

The court notes that if we were to adopt the more restrictive interpretation of *AM Int'l*, that would not affect defendant's indemnification argument as it relates to the state law counts of plaintiff's complaint, since they are not subject to § 9607(e)(1).

tion as one who is secondarily or vicariously liable, a party must be without fault." *Ramos*, 103 N.J. at 191, 510 A.2d 1152.

§ 9607 of CERCLA imposes strict liability for releases or threatened releases of hazardous materials. *E.g. Aceto*, 872 F.2d at 1377; *Monsanto*, 858 F.2d at 167; *Shore Realty*, 759 F.2d at 1042; *Kramer*, 757 F.Supp. at 419. Strict liability does not require any showing of fault. A finding of liability under CERCLA does not necessarily suggest any fault on the part of a liable person, and it further "aris[es] from some positive rule of ... statutory law." Accordingly, a defendant who has been found liable under CERCLA may be entitled to indemnification under New Jersey law.[9]

Plaintiffs argue that Ralph Reeve was primarily rather than secondarily responsible for any contamination because of his management, operation and control of Bowen. In support of their assertion that "[t]he case law uniformly acknowledges that such liability is not vicarious or constructive," plaintiffs rely on *Florida Power & Light Co. v. Allis–Chalmers Corp.*, 752 F.Supp. 434 (S.D.Fla.1990) (*"FPL"*), and *NEPACCO I*, 579 F.Supp. 823. These cases do not support plaintiffs' position.

In *FPL*, the court refused to allow a corporation, Pepper's Steel & Alloys, to recover from another corporation on a common law theory of indemnification, where the release of hazardous substances was directly caused by Pepper's activities. The court found that this direct causal connection to actions taken by Pepper's meant that Pepper's was partially at fault for the release and therefore not entitled to indemnification. 752 F.Supp. at 442. Thus, contrary to plaintiffs' assertion, *FPL* does not hold that managerial control, without more, will establish "fault" nullifying an indemni-

fication agreement between a company and its directors, officers and employees.

The ruling of the district court in *NEPACCO I* is similarly inapplicable to the issue at hand. There, the court found that managerial control was sufficient to establish that individual officer/shareholders were "owners and operators" subject to *strict* liability under CERCLA. 579 F.Supp. at 849. *NEPACCO I* does not consider whether officers are at "fault" for the actions of their company, as distinct from being liable under CERCLA's strict liability standard.

Plaintiffs assert that the indemnification clause should not apply to defendant under the facts of this case. First, plaintiffs reason that defendant is not being sued in his capacity as a "director, officer or employee" of Bowen. Instead, they contend that they are suing Ralph Reeve, through his estate, *personally* for the violation of CERCLA. "The very basis for defendant's liability is Reeve's control over Bowen during the period when hazardous substances were released at the Site." Pl. Brief at 58. Mr. Reeve's control over Bowen was purely a function of his position as president and director, however. Thus plaintiffs do not demonstrate that the Estate is being sued on any basis other than Ralph Reeve's capacity as a "director, officer or employee."

Next, plaintiffs claim that the timing of the by-law revision precludes applying the indemnification clause to the case at hand. Plaintiffs present three bases for this argument. First, they reason that an indemnification clause which predated CERCLA cannot be read to cover liability under CERCLA. However, as discussed in *Southland*, a pre-CERCLA indemnification provision which covers "CERCLA-like" liability applies to claims filed under CERCLA. 696

---

9. Plaintiffs' reliance on *Southland* and on *Chemical Waste Management v. Armstrong World Industries*, 669 F.Supp. 1285 (E.D.Pa. 1987) is not persuasive. In *Southland*, the court found that narrow contractual provisions providing indemnification for limited activities would not indemnify a liable entity under CERCLA. Thus *Southland* did not involve broad indemnification language such as that contained in Bowen's by-laws. *See* 696 F.Supp. at 1001–02. Plaintiffs' citation to *Chemical*

*Waste* is misleading. When that court held that owner/operators must "clearly and unequivocally" redistribute the liability created by Congress in CERCLA, the court was responding to an argument that the parties had *impliedly* agreed to indemnification. Here, on the other hand, the indemnification provision covers "any claim, action, suit or proceeding," which is broad enough to include actions under CERCLA. *See FMC*, 668 F.Supp. at 1292, cited approvingly in *Southland* at 1002.

F.Supp. at 1001. Plaintiffs cite to *Marmon Group, Inc. v. Rexnord, Inc.,* 1986 WL 7070 (N.D.Ill.1986) for the proposition that an indemnity clause put into effect prior to CERCLA could not cover CERCLA liability. The court held as a matter of law that the parties could not have contemplated CERCLA-like liabilities while drafting the clause several years prior to CERCLA's enactment. 1986 WL 7070 at 3. Plaintiffs' reliance on this case is fatally flawed, since the decision was overturned in *Marmon Group, Inc. v. Rexnord, Inc.,* 822 F.2d 31 (7th Cir.1987) (per curiam). While it did not reject the possibility that the clause at issue excluded liability under CERCLA, 822 F.2d at 34, the Seventh Circuit held that it was inappropriate to find that *as a matter of law* a pre-CERCLA indemnification agreement did not cover CERCLA claims. *Id.*[10]

 Second, plaintiffs argue that a contractual agreement for indemnification cannot cover events which occur prior to the formation of that contract. Plaintiffs argue that "[t]o hold otherwise would be contrary to well-settled law in New Jersey that 'a contract speaks as of the date it was signed.' *See, e.g., Einhorn v. Ceran Corp.,* 177 Super. [sic] 442, 450 [426 A.2d 1076] (Ch. Div. 1980), *aff'd,* 185 N.J.Super. 8, 9 [447 A.2d 186] (App.Div.1982)." The actual "well-settled law" in New Jersey, as expressed in *Einhorn,* is stated more fully as follows: "*Unless the parties understand otherwise,* a contract speaks as of the date it was signed." 177 N.J.Super. at 450, 426 A.2d 1076 (emphasis added). Thus there is no *per se* limitation on the right of parties to have a contract apply retroactively.[11]

Third, plaintiffs assert that there is no indication that this particular indemnification clause was intended to apply retroactively. Despite plaintiffs' characterization, it is clear that the provision *was* intended to apply retroactively, however. The by-law covers "[a]ny person who shall be or *who has been*" involved in a claim based on his relation to Bowen, and further includes any person who "is *or was* a director, officer or employee of the company." Since the by-law expressly includes persons *held liable* before the by-law was even enacted, it necessarily extends liability for *actions* taken prior to the by-law revision.[12]

**10.** The court also notes that the indemnification clause at issue in *Marmon Group,* which involved the sale of business assets, arguably was not as broad as the provision adopted by Bowen. The clause stated in relevant part, "Buyer shall be under no liability for debts, liabilities or obligations of Seller incurred prior to or after the Closing or arising out of transactions by Seller or events occurring with respect to Seller in connection with the operation of the business ... unless assumed in writing by Buyer." 1986 WL 7070 at 3. While broad in scope, this clause is nonetheless less encompassing than the Bowen indemnification provision, which covers "any claim, action, suit or proceeding," without reference to whether any actual liability or obligation is incurred, assuming that the covered person is not at fault.

**11.** Plaintiffs' citation to *Armotek Indus., Inc. v. Employers Ins. of Wausau,* 952 F.2d 756 (3d Cir.1991) is irrelevant to the issue before this court. *Armotek* considered the scope of a "clear and unambiguous" insurance policy which limited coverage to "'physical injury to or destruction of tangible property which occurs during the policy period.'" 952 F.2d at 762. The court held that the plaintiff failed to establish that property damage from a 1977 spill of hazardous material occurred "during the policy period," which ran from 1979 to 1985. *Id.* Thus, contrary to plaintiffs' characterization, *Armotek* does not stand for the proposition that indemnification clauses cannot be applied retroactively; rather, it merely enforces a contractual provision limiting the dates of an insurance policy.

**12.** Plaintiffs' argument under §§ 3.6 and 11 of the Stock Purchase Agreement between Stork Inter-America Corp., the Reeve Co., and the Shareholders of the Reeve Co. is without merit. *See* Pl. Reply Brief at 47. § 3.6 states that, except as set forth in a separate schedule, Bowen Engineering had no "liabilities or obligations of any nature, whether absolute, accrued, contingent or otherwise and whether due or to become due" at the time of the stock purchase by Stork. Pl.Ex. A, Stock Purchase Agreement § 3.6 at 8. As discussed above in the context of the doctrine of laches and the statute of limitations, Bowen Engineering did not have any liability or obligation under CERCLA until the DEP issued its report in 1989. § 11 of the purchase agreement is an indemnification clause which is explicitly limited to claims and losses irrelevant to the case at hand. *See id.* § 11.1 at 26–28. Neither of these provisions, which are strictly limited in scope, can be read to impose any general limitation on the coverage of a broad indemnification clause written into the corporate by-laws several years later.

At oral argument, plaintiffs asserted for the first time that defendant is not entitled to indemnification because of discontinuity in the corporate identity. The relevant by-law was enacted by plaintiff Bowen Engineering, Inc., a New Jersey corporation incorporated on November 2, 1973 ("Bowen of New Jersey"). Pl.Supp. Brief Ex. B. Previous to 1973, the North Branch Site was operated by an Idaho corporation also known as "Bowen Engineering, Inc." ("Bowen of Idaho"). The Idaho entity was incorporated in August of 1947 and was dissolved on February 25, 1974. *Id.* Ex. A, C. Since the indemnification clause is contained in the by-laws of Bowen of New Jersey and plaintiffs are seeking to hold defendant liable for actions taken by Bowen of Idaho, plaintiffs reason that the clause is inapplicable to the case at hand.

Defendant, on the other hand, asserts that Bowen of New Jersey is the legal successor to Bowen of Idaho and that the clause applies with equal weight to the predecessor corporation. Thus, on November 2, 1973, the same date that the New Jersey entity was formed, Bowen of New Jersey and Bowen of Idaho entered into an "Assignment and Assumption Agreement" whereby Bowen of New Jersey was assigned all the assets and assumed all the liabilities of Bowen of Idaho as "a legally constituted successor to the business of Bowen of Idaho." Def.Supp. Brief Ex. A.

█ The issue raised by defendant is a variation on the concept of successor corporation liability. Normally, successor corporations are legally distinct from their predecessors and do not assume any of the debts or liabilities of the prior entity. *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 340, 431 A.2d 811 (1981). However, there are four exceptions to this rule of non-liability:

> where (1) the purchasing corporation expressly or impliedly agreed to assume such debts and liabilities; (2) the transaction amounts to a consolidation or merg-

er of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently in order to escape responsibility for such debts and liabilities.

*Id.* at 340–41, 431 A.2d 811.[13]

This action does not fit neatly into the traditional purposes of successor liability theory. Typically, the issue of successor corporate status arises in order to determine whether a corporation is responsible for the acts of a predecessor entity through explicit or constructive assumption of responsibility. Thus, if a distinct successor agrees to assume the debts and liabilities of its predecessor, the two entities need not be identical. Here, the court is faced with the question of whether a by-law adopted by Bowen of New Jersey should be applied to Bowen of Idaho. Thus, the question is a closer one than that which may arise under successor liability. The by-laws of the New Jersey entity can only apply to the Idaho entity if the two corporations are identical. We will therefore concentrate on the "mere continuation" exception to successor non-liability. Further, in order to succeed defendant will have to establish that the 1977 by-law revision was *intended* to apply to the predecessor corporation.

█ In determining whether or not successor liability should be imposed, "[i]t is the duty of the court to examine the substance of the transaction to ascertain its purpose and true intent." *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 310 (3d Cir.) (applying similar Pennsylvania law), *cert. denied* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985). Factors relevant to the "mere continuation" exception include continuity of ownership; continuity of management; continuity of personnel; continuity of physical location, assets and general business operations; and cessation of the prior business shortly after the new entity is formed. *Louisiana–Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1264 (9th

---

**13.** In products liability cases, New Jersey and other states have adopted a broader "products line" approach. *Id.* at 347–48, 431 A.2d 811. The products line approach has its basis in policy reasons which are not relevant to the case at hand, however. *See id.* at 349–53, 431 A.2d 811.

Cir.1990); *Hercules*, 762 F.2d at 310; *see Brotherton v. Celotex Corp.*, 202 N.J.Super. 148, 159, 493 A.2d 1337 (Law Div. 1985). Also relevant is the extent to which the successor intended "to incorporate [the predecessor] into its system with as much the same structure and operation as possible." *Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 244 N.W.2d 873, 882 (1976). Thus the court should determine whether "the purchaser holds itself out to the world as the effective continuation of the seller." *Id.*, 244 N.W.2d at 884. However, the proponent of successor liability need not necessarily establish all of these factors. Thus, for example, "[i]f as a group the same employees continue, without pause to produce the same products in the same plant, with the same supervision, the ownership of the entity which maintains essentially the same name cannot be the sole controlling determinant of liability." *Cyr v. B. Offen & Co., Inc.*, 501 F.2d 1145, 1155 (1st Cir.1974) (mere continuation); *see also Lumbard v. Maglia, Inc.*, 621 F.Supp. 1529, 1535 (S.D.N.Y.1985) (*de facto* merger).

 Under the facts of this case, it is clear that Bowen of New Jersey is a mere continuation of Bowen of Idaho. The very act of assuming the debts and liabilities of its predecessor illustrates that Bowen of New Jersey was intended to be a continuation of the Idaho organization. The Assignment and Assumption Agreement stated explicitly that "Bowen of New Jersey is and shall be a legally constituted successor to the business of Bowen of Idaho." The re-incorporation involved no change in ownership, management, personnel, line of business, principle place of business, facilities or other assets. Both corporations held themselves out to the world as "Bowen Engineering, Inc." Bowen of Idaho was dissolved four months after Bowen of New Jersey was formed. The *only* change to occur was the state of incorporation. Thus, this case presents a classic example of the "mere continuation" exception to the general rule against successor corporation liability.

Furthermore, the court finds that the by-law revision of 1977 was intended to apply to the officers, directors and employees of Bowen of Idaho. First, the very setting in which Bowen of Idaho's board of directors decided to reincorporate as Bowen of New Jersey indicates that the change was considered technical and without impact on the identity of the corporation. The issue was brought out at a meeting of the board on September 7, 1973. Def.Supp. Brief Ex. B, Sept. 7, 1973 Minutes at 8. The minutes of that meeting reflect that the subject came up well into the meeting, following a discussion of the "Basic Vegetable contract" and performance charts, *id.* at 8, and preceding a discussion of "the efforts ... to secure qualified candidates for the post of Executive Vice President." *Id.* at 9. The discussion was summarized in the minutes as follows:

> The Board next discussed reincorporation in New Jersey. For nearly thirty years Bowen has retained its corporate base in Idaho. Because the business has continued in New Jersey, it was decided *to transfer our corporation to New Jersey*. Therefore, upon motion made, seconded and passed, the President was authorized to proceed with preparations to make this change. Since it will be necessary to dissolve the Idaho corporation it was further moved, seconded and passed that the Board of Directors recommend to the stockholders of Bowen Engineering that the Idaho corporation be dissolved and that the assets of Bowen Engineering, Inc. be turned over to the new New Jersey corporation and all of the liabilities of the Idaho corporation be assumed by the new corporation.

*Id.* at 8 (emphasis added). Approval of the final arrangements for reincorporation took place by conference call in a special meeting of the board of directors. *See* Def.Supp. Brief Ex. C. Therefore, the change was viewed by the board as a mundane matter involving nothing more than a technical change in the corporate identity.

Second, as discussed above, the indemnification clause was clearly intended to apply to prior acts and indeed to persons no longer associated with the company.

Third, the all-encompassing nature of the Assignment and Assumption Agreement demonstrates that Bowen of New Jersey was a mere continuation of Bowen of Idaho. Under these circumstances it is clear that Bowen of Idaho and Bowen of New Jersey were identical entities, and that a by-law revision intended to be retroactive would apply equally to the company throughout its history, whether incorporated in Idaho or reincorporated in New Jersey.

██ The indemnification clause applies to a past or present director, officer or employee of Bowen Engineering who is "made a party to a claim, action, suit or proceeding" based on that person's corporate role. The clause indemnifies a covered person for "all costs and expenses, including attorneys' fees," so long as that person has not been "derelict in the performance of his duty as director, officer or employee by reason of willful misconduct, bad faith, gross negligence or reckless disregard of the duties of his officer or employment." Under the facts of this case there can be no doubt that the Estate has been sued because of Ralph Reeve's role as a past director and officer of Bowen Engineering. Furthermore, as discussed above, there is no evidence that Mr. Reeve was in any way at fault or otherwise derelict through willful misconduct, bad faith, gross negligence or reckless disregard of his duties to the company. Therefore, defendant is entitled to indemnification by Bowen Engineering for all costs and expenses, including attorneys' fees, which the Estate incurs as a result of this action.

The court's ruling on the indemnification clause places the litigation in an unusual standing, in which plaintiffs will have to indemnify defendant for any money plaintiffs receive from the Estate under this lawsuit. Further, defendant has a strong interest in a resolution to this matter, since the Estate must remain open so long as the lawsuit is pending. Keeping this matter open pending a determination of actual remedial costs would serve no purpose to plaintiffs and would delay a final settling of Reeve's estate. Accordingly, and in light of fact that defendant impliedly moved for summary judgment on all counts as to liability *and* damages, we will consider whether the resolution of defendant's counterclaim entitles the Estate to summary judgment in plaintiffs' remaining counts on the question of damages.

"[T]he law does not require a party to do a useless act." *Association of Westinghouse Salaried Employees v. Westinghouse Elec. Corp.*, 283 F.2d 93, 96 (3d Cir.1960); *see also Jaffe–Spindler Co. v. Genesco, Inc.*, 747 F.2d 253, 258 (4th Cir. 1984) ("the courts should not require the performance of acts when the doing of them will not further any worthwhile purpose"); *Haase v. Chapman*, 308 F.Supp. 399, 403 (W.D.Mo.1969) (neither law nor equity authorizes the court to order a useless act). Thus, in *Pfeiffer v. Marion Center Area Sch. Dist.*, 917 F.2d 779 (3d Cir. 1990), the Third Circuit noted that it would be futile to remand an action to the district court on the question of liability if there was no possibility that the court would be able to fashion a remedy. *Id.* at 786; *cf. Heffner v. Union Nat'l Bank and Trust Co.*, 639 F.2d 1011, 1018 (3d Cir.1981) (futile to rectify an improper election of board members with a new election where the next regular election was scheduled in one month).

██ Under the facts of this case, any remedy which could be fashioned in favor of plaintiffs would be futile. Regardless of the amount of damages which plaintiffs might receive under Count One, defendant's counterclaim will nullify any recovery. Indeed, plaintiffs will increase their losses should this suit continue, since defendant is also entitled to attorneys' fees generated in response to the action, including the damages stage. Under the circumstances, defendant is entitled to summary judgment on the issue of damages in relation to Counts One and Three. Any other result would be useless, needlessly extending the life of this litigation.

## V. COUNTER–PETITIONS FOR RULE 11 SANCTIONS

Defendant asks the court to impose sanctions pursuant to Federal Rule of Civil

Procedure 11 and 28 U.S.C. § 1927, arguing that plaintiffs should not have brought this suit in light of the indemnification clause. In response, plaintiffs counter-petition for Rule 11 sanctions under the theory that defendant's request for sanctions was itself frivolous. Rule 11 requires that the court impose sanctions where a litigant or attorney makes submissions to the court which are frivolous and intended for improper purposes. "Rule 11 is intended for only exceptional circumstances." *Morristown Daily Record, Inc. v. Graphic Communications Union, Local 8N*, 832 F.2d 31, 32 n. 1 (3d Cir.1987). We are "expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion or other paper was submitted." *Eavenson, Auchmuty & Greenwald v. Holtzman*, 775 F.2d 535, 540 (3d Cir.1985). The appropriate standard for review is whether the litigant or attorney acted reasonably under the circumstances. *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 482 (3d Cir.1987).

■ This court finds no basis for imposing Rule 11 sanctions against plaintiffs for pursuing this action. While the court's ruling on defendant's counterclaim ultimately renders plaintiffs' claims futile, the applicability of the indemnity clause to this action was far from clear. To sanction plaintiffs would involve the imposition of hindsight to a difficult question of law. Accordingly, defendant's petition under Rule 11 will be denied. For the same reasons, sanctions under 28 U.S.C. § 1927 are also inappropriate since it cannot be said that counsel for plaintiffs "multiplie[d] the proceedings ... unreasonably and vexatiously ..." as required under that statute.

■ Although a closer matter, plaintiffs' petition for sanctions will also be denied. "[W]hen issues are close, the invocation of Rule 11 borders on the abusive...." *Gaiardo* at 483. However, the court does not agree with plaintiffs that defendant's request for sanctions was inspired with the intent to harass or for other improper purposes. Viewed from defendant's perspective, the results of this litigation could be considered sufficiently ironic and futile that a motion for Rule 11 sanctions might not seem entirely out of line. The court therefore will also deny plaintiffs' petition for sanctions.

## VI. CONCLUSION

After careful consideration, this court will grant in part and deny in part plaintiffs' motion for summary judgment. Plaintiffs are entitled to summary judgment only on defendant's liability under Count One of the complaint. The court will also grant in part and deny in part defendant's motion for summary judgment. Defendant is entitled to summary judgment on liability under Counts Two, Four, Five, Six, Seven and Eight of plaintiffs' complaint as well as defendant's counterclaim. Further, the court will award summary judgment to the Estate on the issue of damages under Counts One and Three. Finally, we will deny defendant's request for sanctions under Rule 11 and 28 U.S.C. § 1927 as well as plaintiffs' petition for Rule 11 sanctions. The court will issue an order consistent with this opinion.